## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| AMERICAN BANKERS ASSOCIATION ) | |
| 1120 Connecticut Ave NW ) | |
| Washington, D.C. 20036 ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 16-2394 |
| ) | |
| NATIONAL CREDIT UNION ADMINISTRATION ) | |
| 1775 Duke St ) | |
| Alexandria, VA 22314-3428 ) | |
| ) | |
| Defendant. ) | |

_____ )

## COMPLAINT

Plaintiff American Bankers Association ("ABA") brings this Complaint against the National Credit Union Administration ("NCUA") for declaratory and injunctive relief arising from NCUA's violations of the Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1751 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

### NATURE OF THIS ACTION

1.  This action challenges provisions of a Final Rule that expand the universe of members eligible to join a single federally-chartered credit union well beyond the limits established by Congress.  *See* Chartering and Field of Membership Manual, 81 Fed. Reg. 88,412 (Dec. 7, 2016).  A copy of the Final Rule, which was published in the Federal Register on December 7, 2016, is attached as Exhibit 1.

2.  Congress has imposed significant limitations on the field of membership of all federal credit unions.  These statutory limitations ensure that credit unions fulfill their purpose of providing credit to "people of small means" in local communities and in groups that share a

common bond.  FCUA, Pub. L. 73−467, 48 Stat. 1216 (1934).  Because federal credit unions are exempt from federal taxes and most state taxes, *see* 12 U.S.C. § 1751 note, restrictions on the size of federal credit unions are essential to prevent credit unions from obtaining an unfair competitive advantage over banks and other financial institutions that do not enjoy tax-exempt status.

3.     To obtain a charter to operate as a federal credit union, the applicant must show that its members share a common bond.  Congress has determined that the presence of "a meaningful affinity and bond among members, manifested by a commonality of routine interaction, shared and related work experiences, interests, or activities, or the maintenance of an otherwise well-understood sense of cohesion or identity is essential to the fulfillment of the public mission of credit unions."  12 U.S.C. § 1751 note.  *See also Am. Bankers Ass'n v. NCUA*, 2008 WL 2857678, at *13 (M.D. Pa. July 21, 2008) (a common bond "is of paramount importance to credit unions").

4.     The FCUA authorizes NCUA to charter three types of credit unions distinguished by their fields of membership:  (i) single common-bond credit unions, (ii) multiple common-bond credit unions, and (iii) community common-bond credit unions.  12 U.S.C. § 1759(b).  This case concerns NCUA's unwarranted expansion of the field of membership rules applicable to community common-bond credit unions.

5.     Congress has specified that membership in a community common-bond credit union (often referred to simply as a "community credit union") is limited to "[p]ersons or organizations within a well-defined local community, neighborhood, or rural district."  12 U.S.C. § 1759(b)(3).

6.      The Final Rule fails to adhere to the limitations on federal credit unions established by Congress.  By exceeding these statutory limitations, the Final Rule upsets the balance Congress struck between granting federal credit unions tax-favored status and limiting their operations to carefully circumscribed groups or localities that share a common bond.

7.      The Final Rule allows community credit unions to operate even though their field of membership is not limited to a single well-defined local community, neighborhood, or rural district, as Congress directed.  More specifically, the Final Rule declares each of the following geographic areas to be "well-defined local communities":

(i)      up to 2.5 million people in a "combined statistical area" ("CSA"), which is a "larger region" recognized by the Office of Management and Budget ("OMB");

(ii)     up to 2.5 million people in a "core-based statistical area" ("CBSA"), which is an OMB-designated area that includes an urban core and one or more adjacent counties, even if the "core" is excluded from the credit union's field of membership; and

(iii)    areas adjacent to well-defined local communities.

*See* 81 Fed. Reg. at 88,440−41.  The Final Rule also expands the definition of "rural district" beyond reasonable limits by declaring that vast areas, encompassing entire states or large multi-state regions and including up to one million people, are single "rural districts."  *See id.*

8.      This is not the first time NCUA has attempted to expand credit unions' fields of membership beyond the boundaries established by Congress.  In *American Bankers Association v. NCUA*, 347 F. Supp. 2d 1061, 1070 (D. Utah 2004), a federal court criticized NCUA for abdicating its "gatekeeping responsibility to ensure that the 'local' requirement is satisfied."  The court found that NCUA  "cannot act as a rubber stamp or cheerleader" for the credit union industry rather than enforcing the limitations established by Congress.  *Id.*  Similarly, in

*American Bankers Association v. NCUA*, 2008 WL 2857678, at *14 (M.D. Pa. July 21, 2008), the court held that NCUA's decisionmaking process "strongly suggests that determinism, not documentation, drove the NCUA's decision" to expand the field of membership, observing "[t]hat so much of the evidence contrary to the agency's decision went completely unmentioned hardly inspires confidence that the NCUA's decision was the product of reasoned, deliberative decision-making."

9.     The Final Rule suffers from the same type of arbitrary, capricious, and unexplained agency decisionmaking.  Although ABA and others brought these concerns to the attention of NCUA during the notice-and-comment process, NCUA nevertheless adopted rules that expand credit union operations well beyond the limits established by Congress.

10.     ABA brings this action to enjoin and set aside the portions of the Final Rule that violate the FCUA and the APA.  As explained further below, the Final Rule violates 5 U.S.C. § 706(2) because it is contrary to the FCUA provisions codified at 12 U.S.C. § 1759 and because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

**PARTIES**

11.     Plaintiff American Bankers Association ("ABA") is a trade association headquartered in Washington, DC.  ABA is the leading voice of America's $14 trillion banking industry.  Most of its members are small community banks with less than $185 million in assets.  ABA's bank members rely on ABA for advocacy, information, training, products, and services to make their banks more successful and enhance their ability to serve their customers and their communities.   ABA, on behalf of its members, monitors and seeks to enforce competitive fairness in the regulation of financial institutions.

12. Defendant National Credit Union Administration ("NCUA") is an agency of the United States Government that is responsible for administering the FCUA, 12 U.S.C. § 1751 *et seq.*, throughout the United States.

## JURISDICTION AND VENUE

13. This action arises under federal law, specifically the FCUA, 12 U.S.C. § 1751 *et seq.*, and the APA, 5 U.S.C. §§ 500−596, 702, 706 *et seq.*  The declaratory, injunctive, and other relief requested by ABA is authorized by 5 U.S.C. §§ 702 and 706, and this Court's general equitable powers.

14. This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331.

15. Venue in this Court is proper under 28 U.S.C. § 1391(e)(1)(C) because ABA resides in Washington, D.C.

16. NCUA's publication of the Final Rule in the Federal Register on December 7, 2016, constitutes final agency action by NCUA for which there is no other adequate remedy in court within the meaning of 5 U.S.C. § 704.  No other statute governs judicial review of the Final Rule.

17. ABA has standing as an association to bring this action on behalf of its members for purposes of 5 U.S.C. § 702 and Article III of the Constitution.  *See NCUA v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 493−94 (1998) ("As competitors of federal credit unions, [ABA members] certainly have an interest in limiting the markets that federal credit unions can serve, and the NCUA's interpretation has affected that interest by allowing federal credit unions to increase their customer base.").  The Final Rule permits credit unions to expand their tax-exempt operations at the expense of other financial institutions, and numerous credit unions filed comments urging NCUA to allow such expansion.  On information and belief, multiple federally-chartered credit unions are already planning to take prompt advantage of the Final Rule

to expand the scope of their operations.  ABA's member banks compete with credit unions, and thus will suffer competitive injury as a result of provisions in the Final Rule that allow credit unions to serve larger areas and greater numbers of customers.  This competitive injury, which flows directly from the Final Rule, would be redressed by a favorable court ruling.  In addition, ABA's "interest in limiting the markets that federal credit unions can serve is arguably within the zone of interests to be protected by § 109" of the FCUA, 12 U.S.C. § 1759.  *First Nat. Bank & Trust*, 522 U.S. at 485 (internal quotation marks omitted).

18.     ABA has associational standing to represent its member banks because its members would have standing to sue in their own right, the interests ABA seeks to protect are germane to ABA's purposes, and the claims asserted and relief requested in this action do not require the participation of ABA's members as parties.  *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  ABA is well situated to represent the interests of its members, both individually and collectively, in this challenge to the lawfulness of the Final Rule. The interests at stake are directly relevant to ABA's purpose of representing the banking industry, and there is no need for any particular individual bank to participate as a plaintiff in this challenge.

## BACKGROUND

### A.     The Federal Credit Union Act.

19.     Federal credit unions are mutually owned financial institutions chartered and regulated by NCUA pursuant to the FCUA.  Enacted in 1934, the FCUA was intended to "establish a Federal Credit Union System, to establish a further market for securities of the United States and to make more available to people of small means credit for provident purposes through a national system of cooperative credit, thereby helping to stabilize the credit structure of the United States."  FCUA, Pub. L. 73−467, 48 Stat. 1216 (1934).

20.     Federal credit unions benefit from significant tax and regulatory advantages over banks that compete with them for business.  *See* 12 U.S.C. § 1751 note; 12 U.S.C. § 1768.  In particular, federal credit unions and their income generally are exempt from federal, state, and local taxes (except that real and tangible personal property of federal credit unions is subject to taxation to the same extent as other similar property is taxed).  *See* 12 U.S.C. § 1768.  This exemption shields federal credit unions not only from corporate income taxes, but also from state and local sales taxes for direct purchases of goods or services and hotel occupancy taxes on lodging or meals for federal credit union employees travelling on business.[1]  The federal government estimates that the federal income tax exemption alone is worth, on average, $2.68 billion per year to credit unions.[2]

21.     While granting credit unions highly favorable tax treatment, Congress has "restrict[ed] the markets that every federal credit union can serve" and "limit[ed] membership in every federal credit union to members of definable 'groups.'"  *First Nat. Bank & Trust*, 522 U.S. at 492.  These restrictions ensure that credit unions fulfill their purpose of serving "persons or organizations within a local community, neighborhood or rural district that is underserved by other depository institutions," S. Rep. No. 105-193, and their "specified mission of meeting the credit and savings needs of consumers, especially persons of modest means," 12 U.S.C. § 1751 note.  The restrictions are also essential to avoid giving credit unions an unfair competitive advantage over taxpaying banks.

22.     One of the primary limitations that Congress has imposed on federal credit unions is a requirement that their members share a common bond or community of interest.  The FCUA

---

[1] *Available at* https://www.ncua.gov/Legal/GuidesEtc/GuidesManuals/TaxExemptLetter.pdf.
[2] *See* https://www.whitehouse.gov/sites/default/files/omb/budget/fy2017/assets/ap_14_expenditures.pdf.

authorizes NCUA to charter only three types of credit unions, each defined by a different and limited "field of membership":  single common-bond credit unions, multiple common-bond credit unions, and community credit unions.  12 U.S.C. § 1759(b).  The "members" of the credit union—those who are permitted to have accounts with and use the services of the credit union— are limited to eligible persons who share a common bond.  *See id.*  The presence of "a meaningful affinity and bond among members, manifested by a commonality of routine interaction, shared and related work experiences, interests, or activities, or the maintenance of an otherwise well-understood sense of cohesion or identity is essential to the fulfillment of the public mission of credit unions."  12 U.S.C. § 1751 note.

23.     Despite these restrictions, credit unions have leveraged their taxpayer subsidies to significantly expand their operations.  In 1995, only eighteen credit unions had more than $1 billion in assets; by 2015, 261 credit unions exceeded $1 billion in assets.[3]

**B.      The "Field Of Membership" For Community Credit Unions.**

24.     This case involves challenges to NCUA's decision to promulgate new rules that further expand the field of membership for community credit unions well beyond the limits established by Congress in the FCUA.

25.     The FCUA limits a community credit union's field of membership to "[p]ersons or organizations within a well-defined *local* community, neighborhood, or rural district."  12 U.S.C. § 1759(b)(3) (emphasis added).

---

[3] *See* http://www.aba.com/Issues/PublishingImages/LargeCreditUnionsontheRise.jpg.

    **1.      Congress Requires Community Credit Unions To Serve A Single Local Community.**

26.      In 1998, the Supreme Court agreed with ABA that NCUA's permissive policy with respect to chartering certain credit unions violated the field of membership provisions in the FCUA. *First Nat. Bank & Trust*, 522 U.S. at 503.

27.      Congress responded to the Supreme Court's decision by enacting the Credit Union Membership Access Act ("CUMAA"), Pub. L. No. 105–219, 112 Stat. 913 (1998), which amended the FCUA.  The CUMAA provided greater flexibility to federal credit unions in some areas, but imposed greater restrictions in others.

28.      One of the limitations adopted in the CUMAA was Congress's addition of the word "local" to Section 1759(b)(3), which defines the field of membership for a community credit union.  As NCUA acknowledged shortly after the passage of the CUMAA, the express requirement that a well-defined community be "local" "was intended as a limiting factor" and imposed a "more circumspect and restricted approach to chartering community credit unions." Organization and Operations of Federal Credit Unions, 63 Fed. Reg. 71,998, 72,012 (Dec. 30, 1998) ("Interpretive Rule and Policy Statement 99−1").  As a result, a community credit union must "demonstrate more definitively how it meets the local requirement." *Id.*

      **2.      Courts Invalidate NCUA's Attempts To Weaken The Field Of Membership Requirement For Community Credit Unions.**

29.      Responding to pressure from federal credit unions, NCUA repeatedly has sought to weaken the field-of-membership requirement for community credit unions.

30.      On two occasions, federal courts have invalidated NCUA's attempts to expand the field of membership for community credit unions. These decisions demonstrate NCUA's history of unreasonably interpreting the FCUA to favor credit unions.

31.     In 2003, NCUA granted a request from a community credit union in Utah to expand its charter from one county to six counties, an expansion that would have included 1.4 million residents—almost two-thirds of the state's population—and encompassed an area extending from the Nevada border to the Wyoming border of Utah.  After ABA challenged NCUA's decision, the Utah federal district court found that NCUA had failed to ensure that the new charter complied with Section 1759's requirement that a community credit union must serve a single, well-defined local community.  *See Am. Bankers Ass'n v. NCUA*, 347 F. Supp. 2d 1061, 1069 (D. Utah 2004).  The court emphasized that NCUA "must have some gatekeeping responsibility to ensure that the 'local' requirement is satisfied," and "cannot act as a rubber stamp or cheerleader" for the credit union industry.  *Id.* at 1070.

32.     A similar issue arose when NCUA determined that a six-county area in south-central Pennsylvania constituted a single "well-defined local community."  Again, a federal court struck down NCUA's decision, observing that "[t]o a casual observer familiar with central Pennsylvania, it would likely be a remarkable finding that . . . a geographical area of more than 3,000 square miles with a population of over 1.1 million people and encompassing Harrisburg, Hershey, Carlisle, York, Lebanon, Gettysburg, and Shippensburg—constituted a 'well-defined local community.'"  *Am. Bankers Ass'n v. NCUA*, 2008 WL 2857678, at *10 (M.D. Pa. July 21, 2008).

33.     Both decisions criticized NCUA's actions as flawed and biased in favor of expanding credit unions.  The Utah court observed that NCUA failed in its duty to "critically analyze the facts provided in the application to ensure that incomplete and erroneous information does not lead to an improper conclusion" by simply "rubber stamp[ing]" a credit union's request to expand the field of membership of its charter."  *Am. Bankers Ass'n*, 347 F. Supp. 2d at 1070.

The Pennsylvania court expressed concern as to the impartiality of NCUA procedures, finding that NCUA "made an unexplained shift in its approach [that] strongly suggests that determinism, not documentation, drove the NCUA's decision." *Am. Bankers Ass'n*, 2008 WL 2857678, at *13. That court went on to observe "[t]hat so much of the evidence contrary to the agency's decision went completely unmentioned hardly inspires confidence that the NCUA's decision was the product of reasoned, deliberative decision-making." *Id.*

### NCUA'S FINAL RULE VIOLATES THE FCUA AND THE APA

34.     The Final Rule is NCUA's latest attempt to expand Section 1759(b)(3)'s definition of "a well-defined local community, neighborhood, or rural district" beyond the limits established by Congress.

35.     Congress has provided that membership in a community credit union "shall be limited to . . . [p]ersons or organizations within a well-defined local community, neighborhood, or rural district." 12 U.S.C. § 1759(b)(3). As both the Supreme Court and NCUA have recognized, this means that all members of a community credit union must come from a single local community, neighborhood, or rural district. *See First Nat. Bank & Trust*, 522 U.S. at 501−02; 63 Fed. Reg. at 71,998.

36.     NCUA first addressed the meaning of a "well-defined local community, neighborhood, or rural district" in Interpretive Rule and Policy Statement 99−1, published shortly after the CUMAA was enacted. 63 Fed. Reg. at 71,998. There, NCUA stated that its "policy is to limit the community to a single, geographically well-defined area where individuals have common interests or interact." 63 Fed. Reg. at 72,037. At that time, NCUA required an institution seeking a charter to operate as a community credit union to satisfy three requirements: (1) the geographic area's boundaries must be clearly defined; (2) the charter applicant must establish that the area is a well-defined local, community, neighborhood, or rural district; and

(3) the residents in the area must have common interests or interact. *Id.*; *see also* 63 Fed. Reg. at 72,038 (requiring a credit union to submit "documentation to support that [the area] is a well-defined local community, neighborhood, or rural district" and provide a "narrative summary" to "demonstrate the relevance of the documentation provided in support of the application [and] explain how the documentation demonstrates interaction or common interests"). Rather than identifying specific limits or criteria, Interpretive Rule and Policy Statement 99−1 identified various factors that would be considered in deciding whether a proposed area qualified as a well-defined local community. *See* 63 Fed. Reg. at 72,037 (listing factors that included (i) the presence or absence of a single major trade area, shared governmental or civic facilities, or an area newspaper, (ii) the population and geographic size of the proposed community, and (iii) the specific geographic boundaries used to define the community).

37.   Interpretive Rule and Policy Statement 99−1 identified as "examples of community fields of membership": "[p]ersons who live, work, worship, or attend school in, and businesses located in the area of Johnson City, Tennessee, bounded by Fern Street on the north, Long Street on the east, Fourth Street on the south, and Elm Avenue on the west"; "[p]ersons who live or work in Green County, Maine"; "[p]ersons who live, worship, or work in and businesses and other legal entities located in Independent School District No. 1, DuPage County, Illinois"; "[p]ersons who live, worship, work, or attend school at the University of Dayton, in Dayton, Ohio"; and "[p]ersons who work for businesses located in Clifton Country Mall, in Clifton Park, New York." 63 Fed. Reg. at 72,038−89. NCUA also identified the following examples of unacceptable fields of membership: congressional districts, "[p]ersons who live or work in the Greater Boston Metropolitan Area" and "[p]ersons who live or work in the State of

California" as unacceptable fields of membership that do not "meet the definition of a local community, neighborhood, or rural districts."  63 Fed. Reg. at 72,039.

38.     In December 2015, NCUA issued a notice of proposed rulemaking announcing its intention to significantly expand the field of membership for community credit unions.  *See* Proposed Rule, Chartering and Field of Membership Manual, 80 Fed. Reg. 76,748 (Dec. 10, 2015).  As ABA explained in its February 2016 comments in response to NCUA's notice of proposed rulemaking,[4] NCUA's "proposal would eviscerate many major limitations placed on credit union field of membership expansion," and this "expansion of taxpayer subsidized financial institutions is inconsistent with the limited scope of credit union operations envisioned by Congress."  Furthermore, the proposed rules "would directly undermine the ability of taxpaying banks to serve their communities—replacing healthy, private sector financial services with government subsidized competition."

39.     ABA's concerns largely went unheeded.  The Final Rule's amendments to NCUA's field of membership requirements governing community credit unions are contrary to statutory constraints and to Congress's intent to require "a meaningful affinity and bond among members" of a federal credit union.  12 U.S.C. § 1751 note.

40.     The Final Rule interprets Congress's requirement that community credit unions cover "a well-defined local community, neighborhood, or rural district" in a way that permits a single "community" credit union to serve an area that is far larger than a single "local community" or "rural district."  No reasonable agency could conclude that the vast areas covered by the Final Rule constitute a single "well-defined local community" or "rural district."

---

[4]     *See*   http://www.aba.com/Advocacy/commentletters/Documents/JamesChessenCommentson NoticeofProposedRulemakingRegardingAssociationalCommonBond.pdf.

41.    As explained below, the Final Rule is inconsistent with the language of Section 1759(b)(3) and/or NCUA's prior interpretations of that statute in at least four respects.

**A.    Combined Statistical Areas Are Not "Well-Defined Local Communities."**

42.    The Final Rule declares each "combined statistical area" ("CSA") recognized by the OMB to be "a well-defined local community."  *See* 81 Fed. Reg. at 88,440.

43.    As NCUA acknowledged in its notice of proposed rulemaking, CSAs are "larger regions."  80 Fed. Reg. at 76,749.  A "larger region" is not a single "local community."

44.    Many CSAs have populations in the millions or even tens of millions and unite far-flung communities across multiple states.   For instance, the Washington-Baltimore-Arlington, DC-MD-VA-WV-PA CSA has a population of more than nine million, and includes the District of Columbia, most of Maryland, a large portion of Northern Virginia, three counties in West Virginia, and one county in Pennsylvania.  This CSA (pictured in varying shades of green below) includes not only the entire Washington and Baltimore metropolitan areas, but also six additional metropolitan and "micropolitan" areas.  No reasonable definition of "a well-defined local community" could include so many different communities spread over such a large area.



45.     Other examples of CSAs that include far more than a single, well-defined local community are equally striking:

- The New York-Newark, NY-NJ-CT-PA CSA contains nearly 24 million people—about one in every thirteen people in the United States—stretching from Allentown-Bethlehem, Pennsylvania to Montauk, Long Island.

- The Los Angeles-Long Beach-Riverside, CA CSA contains approximately 19 million people from Los Angeles to sparsely populated desert on the Nevada and Arizona borders, spread across an area *larger than many entire states*.

- The Boston-Worcester-Providence, MA-RI-NH-CT CSA contains approximately eight million people spread across Greater Boston (including about half of Massachusetts), Greater Providence (including all of Rhode Island but a single town), much of New Hampshire, and a portion of Connecticut.

46.     The Final Rule limits the field of membership for a CSA-based community credit union to 2.5 million people, *see* 81 Fed. Reg. at 88,440, but that limitation does not satisfy Congress's "well-defined local community" requirement.  Because the Final Rule defines the entire Baltimore-Washington-Arlington CSA as a single well-defined local community, it allows

a credit union to serve any subset of cities, counties, or towns in this vast area, so long as the total population in the selected area does not exceed 2.5 million members.  NCUA's new approach does not come close to limiting community credit unions to a single, well-defined local community.[5]

47.     By deeming every CSA to be "a well-defined local community," NCUA has gone beyond even the field of membership struck down in *Am. Bankers Ass'n v. NCUA*, 347 F. Supp. 2d 1061, 1067 (D. Utah 2004).  The Final Rule deems Utah's Salt Lake City-Ogden-Clearfield CSA a "well-defined local community," even though that CSA contains eight counties—the six counties at issue in the prior challenge, plus two more.

48.     The Final Rule represents a dramatic departure from NCUA's 1999 interpretation. At that time, NCUA identified "[p]ersons who live or work in the Greater Boston Metropolitan Area" and "[p]ersons who live or work in the State of California" as paradigmatic examples of fields of membership that do not "meet the definition of a local community, neighborhood, or rural districts."  63 Fed. Reg. at 72,039.  The Final Rule reverses this determination without any meaningful explanation as to why NCUA has changed its view.

**B.     Core-Based Statistical Areas Are Not "Well-Defined Local Communities" Without Their Core.**

49.     A core-based statistical area ("CBSA") is an OMB-designated group of one or more adjacent counties with an urban core area of at least 10,000 people and any adjacent territory that shares social and economic ties with the core as measured by commuting patterns. The urban "core area" includes the most populated county or named municipality in the CBSA's

---

[5]  The same day that NCUA issued the Final Rule, the agency proposed to *quadruple* this 2.5 million cap and allow a CSA-based community credit union to serve populations of up to 10 million people.  *See* Proposed Rule, Chartering and Field of Membership Manual, 81 Fed. Reg. 78,748, 78,751 (Nov. 9, 2016).

title, and is the "focal point for common interests and interaction among residents."  80 Fed. Reg. at 76,749.

50.     Since 2010, NCUA has deemed core-based statistical areas to be "well-defined local communities."  *See* Chartering and Field of Membership for Federal Credit Unions, 75 Fed. Reg. 36,257, 36,258−59 (June 25, 2010).  Under this approach, NCUA has required a CBSA-based community credit union to serve the "core area" of the CBSA.  *Id.*

51.     The Final Rule drops the requirement that a CBSA-based community credit union serve the "core area" of the CBSA.  *See* 81 Fed. Reg. at 88,440.  This change eliminates the basis for deeming CBSAs to be "well-defined local communities," because outlying areas can be considered part of a single, well-defined local community only because of their association with the core urban area.  The Final Rule thus permits communities as far-flung as Frederick, Maryland and Fredericksburg, Virginia to constitute a single field of membership, without including Washington, DC, even though Frederick and Fredericksburg have little in common beyond the similarity of their names.

52.     Eliminating NCUA's core area requirement allows credit unions to serve only wealthier suburban areas while excluding low-income and minority communities in the urban core.  Unlike ABA's members, federal credit unions are not required to comply with the Community Reinvestment Act, 12 U.S.C. § 2901 *et seq.*, which was enacted to ensure that financial institutions help meet the needs of borrowers in all segments of their communities, including low- and moderate-income neighborhoods.

53.     The Final Rule also authorizes community credit unions to serve CBSAs that have more than 2.5 million people so long as the field of membership itself does not exceed 2.5 million people.  *Id.*  Particularly when coupled with the fact that a credit union can exclude a

"core area" from a CBSA, the resulting field of membership is no longer limited to a "well-defined local community."  Yet under the Final Rule, it is deemed to be just that.

### C. "Rural Districts" Cannot Include Entire States, Plus Parts of Additional States, or Up to a Million People.

54.    A credit union can qualify as a community credit union if it serves a field of membership consisting of "[p]ersons or organizations within a well-defined . . . rural district." 12 U.S.C. § 1759(b)(3).

55.    Prior to the Final Rule, NCUA's regulations provided that the total population of a "rural district"-based community credit union could not exceed 250,000 or three percent of the state's population, whichever was larger.  Chartering and Field of Membership Manual for Federal Credit Unions, 78 Fed. Reg. 13,460, 13,461 (Feb. 28, 2013).  These limitations reflected NCUA's view that a rural district should have a "relatively small" population.  80 Fed. Reg. at 76,751.

56.    The Final Rule dramatically expands the definition of a "rural district."  The Final Rule quadruples the numeric limit—to a population of one million—and completely eliminates the percentage limit.  *See* 81 Fed. Reg. at 88,440.  These changes permit several entire states (Alaska, North Dakota, South Dakota, Vermont, and Wyoming) to qualify as a single "rural district."  *See id.*  Moreover, the Final Rule allows rural districts to cross into a *second* state, *see id.*, so that a single "rural district" now can include, for example, all of Wyoming and most of Montana.

57.    The ordinary meaning of "rural district" does not include such massive areas.  A rural district is "a subdivision of an administrative county that usually embraces several country parishes and is governed by a council."  Merriam-Webster Dictionary Online; *see also* Oxford English Dictionary Online ("rural district" means "[a] group of country parishes governed by an

elected council").  In light of the ordinary meaning of the term "rural district," Congress could not have intended "rural districts" to encompass a field of membership consisting of a million people across entire states or multiple states.

58.    Whatever efficiencies may result from larger credit unions, Congress authorized community credit unions to operate only in "a well-defined local community, neighborhood, or rural district."  The statutory language contains no exception allowing credit unions to operate more broadly if doing so would be efficient.

**D.    Adjacent Areas Are Not Part of "Well-Defined Local Communities" or "Rural Districts."**

59.    In 2003, NCUA declared that the "well-defined local community, neighborhood, or rural district requirement is met if the area to be served is in a recognized single political jurisdiction, *i.e.*, a city, county, or their political equivalent, or any contiguous portion thereof." Organization and Operation of Federal Credit Unions, 68 Fed. Reg. 18,334, 18,357 (Apr. 15, 2003).  The Final Rule allows a credit union to expand outside of a political jurisdiction (i.e., a city or a county), a CSA, a CBSA, or a rural district to any "immediately adjacent area" to these geographic units.  *See* 81 Fed. Reg. at 88,440.

60.    This aspect of the Final Rule is inconsistent with the requirement that a community credit union must serve a single "well-defined local community."  By definition, an area adjacent to a well-defined local community is not part of that "well-defined" local community.  Congress has not authorized a community credit union to serve a "well-defined local community," plus areas adjacent to that community.  NCUA's approach effectively allows credit unions to expand indefinitely, in virtually any direction, beyond the boundaries of their local community, contrary to the intent of Congress.

61.     Although there is likely to be *some* interaction between individuals on either side of almost any geographic boundary line in the United States, that peripheral interaction is not enough to establish that an area adjacent to a well-defined local community is a part of the community, and NCUA does not require that the adjacent area have the attributes that led to the original determination of "a well-defined local community."  The Final Rule thus permits NCUA to rubber stamp the expansion application of any credit union, paving the way for uncontrolled enlargement of credit unions beyond the "local community" lines Congress required.

**COUNT I**
**Administrative Procedure Act and Federal Credit Union Act – Agency Action**
**in Excess of Statutory Authority**

62.     ABA adopts and incorporates by reference Paragraphs 1–61 of this Complaint as if fully set forth herein.

63.     NCUA is an agency subject to the requirements of the APA.   5 U.S.C. § 701(b)(1).   "[A]gency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" shall be held "unlawful and set aside."  5 U.S.C. § 706(2)(C).

64.     The Final Rule exceeds NCUA's statutory authority to authorize community credit unions under 12 U.S.C. § 1759 for the following reasons: (i) combined statistical areas and core-based statistical areas without their core are not single "well-defined local communities"; (ii) an area with a population of up to one million that includes an entire state, or an entire state and a large portion of an additional state, is not a single "rural district"; and (iii) a single well-defined local community or rural district does not include areas adjacent to the community simply because there is some interaction between individuals on either side of the community boundary line.

65.     Because the Final Rule exceeds NCUA's statutory authority under the FCUA, ABA is entitled to relief under 5 U.S.C. §§ 702, 706(2)(A) & (C).

## COUNT II
## Administrative Procedure Act - Arbitrary and Capricious Action

66.     ABA adopts and incorporates by reference Paragraphs 1–65 of this Complaint as if fully set forth herein.

67.     NCUA is an agency subject to the requirements of the APA.  5 U.S.C. § 701(b)(1).  "[A]gency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" shall be held "unlawful and set aside."  5 U.S.C. § 706(2)(A).

68.     The Final Rule is arbitrary and capricious, in violation of 5 U.S.C. § 706(2), because NCUA failed to adequately explain why:  (i) combined statistical areas and core-based statistical areas without their core areas are "well-defined local communities"; (ii) a "rural district" that includes a population of up to one million and that spans entire states or multiple states; and (iii) a "well-defined" local community or rural district can include areas adjacent to an existing "well-defined" community.

69.     Because the Final Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, ABA is entitled to relief under 5 U.S.C. §§ 702, 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ABA respectfully requests that this Court enter judgment in its favor and against Defendant NCUA and award the following relief:

a)  enter a declaratory judgment that the Final Rule exceeds NCUA's statutory authority under 12 U.S.C. § 1759 and is arbitrary, capricious, an abuse of discretion, and is otherwise not in accordance with law in violation of 5 U.S.C. §§ 702-706;

b) vacate and set aside the portions of the Final Rule challenged in this Complaint;

c) permanently enjoin NCUA from granting approval of any expansion of any federal credit union's field of membership pursuant to the Final Rule;

d) award ABA its reasonable costs, including attorneys' fees incurred in bringing this action; and

e) grant ABA any and all other additional relief as this Court may deem just and proper.

Respectfully submitted,

 /s/ Robert A. Long, Jr.

Robert A. Long, Jr. (D.C. Bar No. 415021)
Andrew Soukup (D.C. Bar No. 995101)
Philip Levitz (D.C. Bar No. 1018430)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001
(202) 662-6000 (Telephone)
rlong@cov.com
asoukup@cov.com
plevitz@cov.com

*Attorneys for Plaintiff*
December 7, 2016                 *American Bankers Association*