**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN BANKERS ASSOCIATION | ) | |
| 1120 Connecticut Ave. NW | ) | |
| Washington, D.C.  20036 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-02394-KBJ |
| | ) | |
| NATIONAL CREDIT UNION | ) | |
| ADMINISTRATION | ) | |
| 1775 Duke Street | ) | |
| Alexandria, VA  22314-3428 | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF OF AMICUS CURIAE STATE ASSOCIATIONS
IN SUPPORT OF PLAINTIFF AMERICAN BANKERS ASSOCIATION**

Julie Johnson McLean (AT#0005185)
Robert A. Gamble (AT#0002809)
Davis Brown Law Firm
215 10th Street, Suite 1300
Des Moines, IA  50309
Telephone: (515) 288-2500
Facsimile:  (515) 243-0654
Email:  beaugamble@davisbrownlaw.com
        juliemclean@davisbrownlaw.com


Frank A. Keating
Steven D. Gordon
Holland & Knight LLP
800 17th Street N.W., Suite 1100
Washington, DC  20006
Telephone: (202) 955-3000
Facsimile:  (202) 955-5564

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................iii

INTRODUCTION ..........................................................................................1

IDENTITY OF AMICUS CURIAE, INTEREST IN CASE,
AUTHORITY AND DISCLOSURE STATEMENT ...........................................1

BRIEF POINT I
   THE DEFINITIONS OF WELL-DEFINED LOCAL COMMUNITY AND RURAL
   DISTRICT IN THE FINAL RULE EXCEED THE AUTHORITY OF
   THE NCUA BOARD ...................................................................................3

BRIEF POINT II
   THE FINAL RULE WILL HAVE A SUBSTANTIAL ADVERSE IMPACT ON
   COMMUNITY BANKS AND THE BANKING INDUSTRY ......................................8

BRIEF POINT III
   EXCLUSION OF A CORE AREA FROM A CORE BASED STATISTICAL
   AREA CONTRAVENES CONGRESSIONAL INTENT ...............................................9

BRIEF POINT IV
   THE FINAL RULE UNREASONABLY EXPANDS "RURAL DISTRICTS" .............14

BRIEF POINT V
   THE FINAL RULE MAY CAUSE STATE CREDIT UNIONS TO CONVERT
   TO FEDERAL CREDIT UNIONS ..................................................................19

BRIEF POINT VI
   THE NCUA'S DEFINITIONS OF WELL-DEFINED LOCAL COMMUNITY
   AND RURAL DISTRICT ARE NOT ENTITLED TO CHEVRON DEFERENCE.......20

BRIEF POINT VII
   GIVEN EXCLUSION FROM THE COMMUNITY REINVESTMENT ACT,
   THE FINAL RULE'S DELETION OF "CORE AREA" FROM THE DEFINITION
   OF CORE BASED STATISTICAL AREA ENABLES CREDIT UNIONS TO
   IGNORE CONGRESSIONAL INTENT THAT CREDIT UNIONS PROVIDE
   CREDIT TO PEOPLE OF MODEST MEANS AND PROVIDES A FURTHER
   COMPETITIVE ADVANTAGE OVER COMMUNITY BANKS..................................22

CONCLUSION ....................................................................................................23

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Chevron, U.S.A. Inc. v. Natural Resource Defense Council, Inc.*,
467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ................................................20,21

*City of Arlington, Tex. v. F.C.C.*, — U.S. —, 133 S.Ct. 1863, 1868,
185 L.Ed.2d 941 (2013) .........................................................................................................21

*Cuomo v. Clearing House Assn., L.L.C.*, 557 U.S. 519, 525, 129 S.Ct. 2710,
174 L.Ed.2d 464 (2009) .........................................................................................................21

*First Nat. Bank and Trust Co. v. Nat. Credit Union Admin.*,
988 F.2d 1272, 1274 (D.C. Cir. 1993) ...............................................................................10,20

*First Nat. Bank of Fayetteville v. Smith*, 365 F.Supp. 898, 903 (W.D. Ark. 1973),
*rev'd on other grounds*, *First Nat. Bank of Fayetteville v. Smith*,
508 F.2d 1371 (8th Cir. 1974) ................................................................................................21

*Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ..............10

*Smith v. Commr. of Social Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) .....................................10

*Utility Air Regulatory Group v. E.P.A.*, — U.S. —, 134 S.Ct. 2427, 2439,
189 L.Ed.2d 372 (2014) .........................................................................................................21

*Whitehead Street, Inc. v. Secretary of U.S. Dept. of Agriculture*,
701 F.3d 1345 (11th Cir. 2012) ..............................................................................................21

**Statutes and Regulations**

12 C.F.R. parts 25, 228, 345, and 195 ....................................................................................22

12 C.F.R. § 228.29 ..................................................................................................................22

48 Stat. 1216, 1219 (1934) ...............................................................................................2,3,23

63 Fed. Reg. at 72,012 .............................................................................................................4

63 Fed. Reg. at 72,037 .............................................................................................................4

63 Fed. Reg. at 72,038 .............................................................................................................5

63 Fed. Reg. at 72,038−39 .......................................................................................................5

63 Fed. Reg. at 72,039 ...................................................................................5

Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* ..........................1

Appendix B to 12 C.F.R. Part 701 ..................................................................2

Chartering and Field of Membership Manual, 81 Fed. Reg. at 88,440 ...............6,8,9,14

Chartering and Field of Membership Manual, 81 Fed. Reg. at 88,415-88,416 .................7,9

Chartering and Field of Membership Manual, 81 Fed. Reg. at 88,441 ...........................7

Chartering and Field of Membership Manual, 81 Fed. Reg. at 88,442 ...........................9

Chartering and Field of Membership Manual, 81 Fed. Reg. 88,412 (Dec. 7, 2016)
(to be codified at 12 C.F.R. pt. 701) ...........................................................2

Community Reinvestment Act, 12 U.S.C. 2901 ...............................................2,22

CUMAA, Pub. L. No. 105-219, 112 Stat. 913 (1998) .........................................3,4,10,20

Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1751 *et seq.*...........................1,3

FCUA, 12 U.S.C. § 1759(b) ...........................................................................2,4,20

FCUA, 12 U.S.C. § 1759(b)(3) ........................................................................3

FCUA, 12 U.S.C. § 1759(g)(1) ........................................................................2

FCUA, 12 U.S.C. § 1768 ................................................................................2

Iowa Code Chapter 504 ..................................................................................1

Iowa Code § 533.202 .....................................................................................19

Organization and Operations of Federal Credit Unions, 63 Fed.
Reg. 71,998 (Dec. 30, 1998)............................................................................4

Pub. L. No. 86-354, 73 Stat. 628, 631 (1959) ....................................................3

Pub. L. No. 105-219, 112 Stat. 913 ...........................................................3,4,10,20

**Other Administrative Materials**

U.S. Census Bureau, *Annual Estimates of Resident Population: April 1, 2010 to July 1, 2016-United States-Metropolitan and Micropolitan Statistical Area; and for Puerto Rico,*
https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk .............. 11,12,13,14,18

U.S. Census Bureau, *QuickFacts,*
https://www.census.gov/quickfacts/table/PST045216/2758000,2743000,00 ................................ 11

U.S. Census Bureau, *QuickFacts*,
https://www.census.gov/quickfacts/table/PST045216/00 .............................................. 11

U.S. Census Bureau, *QuickFacts*,
https://www.census.gov/quickfacts/table/PST045216/2717288,2751730,2740166,2718188,2718116; *see also* https://www.census.gov/quickfacts/table/PST045216/2743252,2724308 ....................... 11

U.S. Census Bureau, *QuickFacts*,
https://www.census.gov/quickfacts/table/PST045216/2622000 ...................................... 12

U.S. Census Bureau, *QuickFacts*,
https://www.census.gov/quickfacts/table/PST045216/2659440,2616313120,2680700,2612585480,2608640,2612509110; see also
https://www.census.gov/quickfacts/table/PST045216/2649000,2627440,2669035 ....................... 12

U.S. Census Bureau, *QuickFacts*,
https://www.census.gov/quickfacts/table/PST045216/1714000 .................................... 12

U.S. Census Bureau, *QuickFacts*,
https://www.census.gov/quickfacts/table/PST045216/1751622,1753481,1734722,1782075,1735307,1782530; *see also*
https://www.census.gov/quickfacts/table/PST045216/1757875,1729938,1743744,1723620 ........... 13

U.S. Census Bureau, *QuickFacts*,
https://www.census.gov/quickfacts/table/PST045216/2965000 ...................................... 13

U.S. Census Bureau, *QuickFacts*,
https://www.census.gov/quickfacts/table/PST045216/2978154,2914572,2913600,2917272,2973618,2939656; *see also* https://www.census.gov/quickfacts/table/PST045216/2945668,2939044,2903160 ........... 13

U.S. Census Bureau, *QuickFacts*, https://www.census.gov/quickfacts/table/PST045216/02,38,46,50,56,00
.............................................................................................. 14

U.S. Census Bureau, *QuickFacts*, https://www.census.gov/quickfacts/table/PST045216/4659020,0203000
.............................................................................................. 14

U.S. Census Bureau, *QuickFacts*,
https://www.census.gov/quickfacts/table/PST045216/06 ................................................................... 17

U.S. Census Bureau, *QuickFacts*,
https://www.census.gov/quickfacts/table/PST045216/0423620 ...................................................... 17

**Dictionaries**

Merriam-Webster Dictionary Online, *Rural*,
https://www.merriam-webster.com/dictionary/rural .......................................................................... 15

Dictionary.com, *Rural*, http://www.dictionary.com/browse/rural?s=t ....................................... 15

Thesaurus.com., *Rural*, http://www.thesaurus.com/browse/rural?s=t ....................................... 15

**Exhibits**

Exhibit A - List of Additional Bankers Associations
Exhibit B - Map of Minneapolis CBSA
Exhibit C - Statistical Summary of US Census Data - County Population and Square Mileage

## INTRODUCTION

The Iowa Bankers Association ("IBA"), together with the state banking associations representing banks in all of the other forty-nine (49) states (the "Additional Bankers Associations") identified in <u>Exhibit A</u> attached (collectively, with IBA, the "State Associations"), submit this Brief in support of the Motion for Summary Judgment of the American Bankers Association ("ABA"), filed against the National Credit Union Administration ("NCUA") for declaratory and injunctive relief arising from NCUA's alleged violations of the Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1751 *et seq.,* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

## IDENTITY OF *AMICUS* CURIAE, INTEREST IN CASE, AUTHORITY AND DISCLOSURE STATEMENT

IBA was initially formed in 1887 for the purpose of supporting banks in Iowa by providing leadership, advocacy, information and education to its members, their commercial and consumer customers, and the public.  IBA is an Iowa nonprofit corporation organized under Iowa Code Chapter 504.  The current membership of IBA consists of approximately 318 state and national banks and savings associations representing 98% of such banks and associations operating in Iowa. There is no parent corporation of IBA, nor does any publicly-held corporation own 10% or more of its stock.

The Additional Bankers Associations all serve a similar purpose, and are all similarly organized, non-profit organizations that represent a substantial number of the community banks and savings associations in their respective states.  The IBA and the Additional Bankers Associations represent a substantial number of community banks and savings associations that are not members of the ABA.

The establishment clause of the FCUA states that the purpose of the federal credit union system is "to make more available to people of small means credit for provident purposes…". FCUA, Pub. L. 73-467, 48 Stat. 1216 (1934).  The State Associations have an interest in this case because if not struck, the Final Rule will substantially expand the authority of tax exempt federal credit unions to provide the full range of banking services in areas they select without regard to their initial mission and unimpaired by the Community Reinvestment Act and other regulatory restrictions applicable to banks.

The FCUA, specifically 12 U.S.C. § 1759(b), contains well-defined limits on the field of membership for all federal credit unions, pursuant to which a federal credit union may be a (i) single common-bond, (ii) multiple common-bond, or (iii) community common-bond credit union (a "Community Credit Union").  Federal credit unions are exempt from the payment of federal taxes and most state taxes, except for state and local property tax.  12 U.S.C. § 1768.  The pending case relates to amendments by the NCUA to field of membership rules in the Chartering and Field of Membership Manual, 81 Fed. Reg. 88,412 (Dec. 7, 2016) (to be codified at 12 C.F.R. pt. 701) (the "Final Rule") and specifically the sections of Appendix B to 12 C.F.R. Part 701 that expand the field of membership for Community Credit Unions.

Implementation of the Final Rule relating to the expanded field of membership will have a substantial adverse effect on banks in states across the nation.  Because of their tax-advantaged status, credit unions are able to offer financial products in direct competition with banks at a substantially lower cost.  By expanding the definition of the field of membership for Community Credit Unions, the NCUA has exceeded the statutory authority granted to it pursuant to 12 U.S.C. § 1759(g)(1) that limits the field of membership of Community Credit Unions to "persons or

organizations within a well-defined local community, neighborhood, or rural district." 12 U.S.C. § 1759(b)(3).

This Brief is filed upon the authority of the Board of Directors and the President of IBA and the Board of Directors or the Chief Executive of each of the Additional Bankers Associations. Counsel for IBA authored this *Amicus* Brief in its entirety.  No counsel for ABA or NCUA has authored this Brief, in whole or in part, nor has ABA or NCUA or their respective counsel contributed money to fund the preparation or submission of this Brief.  No entity other than IBA and the membership of the Additional Bankers Associations have contributed funds to cover the costs of the preparation and submission of this *Amicus* Brief.

<u>Brief Point I</u>

THE DEFINITIONS OF WELL-DEFINED LOCAL COMMUNITY AND RURAL DISTRICT
IN THE FINAL RULE EXCEED THE AUTHORITY OF THE NCUA BOARD.

The FCUA was originally enacted in 1934.  Its purpose was to make credit available and promote thrift through a national system of nonprofit, cooperative credit unions.  From the outset, the Act limited the membership of a credit union to "groups within a well-defined neighborhood, community, or rural district."  48 Stat. 1216, 1219 (1934).  Significant amendments were made to the Act in 1959, but the restrictions on membership remained the same: "Federal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district."  Pub. L. No. 86-354, 73 Stat. 628, 631 (1959).

In 1998, Congress enacted the Credit Union Membership Access Act ("CUMAA") "to amend the Federal Credit Union Act to clarify existing law with regard to the field of membership of Federal credit unions."  Pub. L. No. 105-219, 112 Stat. 913.  Congress defined three different types of membership field: (i) single common bond - one group that has a common bond of

occupation or association; (ii) multiple common bond - more than one group, each of which has (within the group) a common bond of occupation or association, and the number of members of each group when first included in the field of membership does not exceed 3,000; and (iii) a Community Credit Union, defined as "persons or organizations within a well-defined local community, neighborhood, or rural district." 12 U.S.C. § 1759(b). When it enacted this legislation, Congress made the following findings:

> "(3) To promote thrift and credit extension, a meaningful affinity and bond among members, manifested by a commonality of routine interaction, shared and related work experiences, interests, or activities, or the maintenance of an otherwise well-understood sense of cohesion or identity is essential to the fulfillment of the public mission of credit unions.
>
> (4) Credit unions, unlike many other participants in the financial services market, are exempt from Federal and most State taxes because they are member-owned, democratically operated, not-for-profit organizations generally managed by volunteer boards of directors and because they have the specified mission of meeting the credit and savings needs of consumers, especially persons of modest means. "

Pub. L. No. 105-219, 112 Stat. 913 (emphasis added).

Shortly after the enactment of the CUMAA, the NCUA took steps to implement its provisions. *See* Organization and Operations of Federal Credit Unions, 63 Fed. Reg. 71,998 (Dec. 30, 1998). NCUA acknowledged that the express requirement that a community be "local" "was intended as a limiting factor" and imposed a "more circumspect and restricted approach to chartering community credit unions." *Id.* at 72,012. NCUA identified several factors that would be considered in deciding whether a proposed area qualified as a well-defined local community, including (i) the presence or absence of single major trade area, shared governmental or civic facilities, or an area newspaper, (ii) the population and geographic size of the proposed community, and (iii) the specific geographic boundaries used to define the community. *Id.* at 72,037.

4

NCUA also identified "examples of community fields of membership" and "unacceptable" fields of membership.  *Id.* at 72,038.  Acceptable fields of membership include:

> • "Persons who live, work, worship, or attend school in, and businesses located in the area of Johnson City, Tennessee, bounded by Fern Street on the north, Long Street on the east, Fourth Street on the south, and Elm Avenue on the west";

> • "Persons who live or work in Green County, Maine";

> • "Persons who live, worship, or work in and businesses and other legal entities located in Independent School District No. 1, DuPage County, Illinois";

*Id.* at 72,038−39.

> "[U]nacceptable local communities, neighborhoods, or rural districts" include:

> • "Persons who live or work in the Greater Boston Metropolitan Area (does not meet the definition of local community, neighborhood, or rural district)."

> • "Persons who live or work in the State of California (does not meet the definition of local community, neighborhood, or rural district)."

*Id.* at 72,039.

The Final Rule effects a sea change in the "field of membership" of Community Credit Unions and obliterates the limitations that Congress has imposed on them for more than 80 years.

Before the Final Rule, the field of membership for Community Credit Unions was limited to persons or organizations within a well-defined local community and persons or organizations within a rural district.  The geographic units of a well-defined local community included two "Presumptive Communities" so the membership of a Community Credit Union was limited to the following:

(A)     A Single Political Jurisdiction, *i.e.*, a city, county, or their political equivalent or portion thereof, regardless of population.

(B)     A Core Based Statistical Area (designated by the U.S. Census Bureau or a Metropolitan Division within a CBSA or a portion thereof), in either case, subject to a 2.5 million population limit.  The Core Based Statistical Area was required to include the "Core Area" defined as the most populated county or named municipality in the Core Based Statistical Area's title.

(C)     A rural district restricted to an area with a population not to exceed the greater of 250,000 people or 3% of the population within the Community Credit Union's home state.

The Final Rule amends the definitions of a Single Political Jurisdiction and a Core Based Statistical Area, adds a third Presumptive Community, expands the rural district, and adds adjacent areas as follows:

(A)     A Single Political Jurisdiction or any individual portion thereof ("SPJ"), regardless of population.

(B)     A CBSA, or a Metropolitan Division within a CBSA, or portion thereof, in any case, subject to a 2.5 million population limit.  The requirement that the CBSA include the "Core Area" of the CBSA (*i.e.*, the most populated county or named municipality in the title of the CBSA) has been removed.  Chartering and Field of Membership Manual, 81 Fed. Reg. at 88,440.  As a result, the field of membership for a Community Credit Union based on a CBSA or a portion thereof is no longer required to include the Core Area of the CBSA, but may include, or be limited to, other wealthier areas of the CBSA or Combined Statistical Area, including adjacent areas, while excluding the Core Area, so long as the total population in the area or areas selected does not exceed 2.5 million.

(C)     One of 174 Combined Statistical Areas as designated by the Office of Management and Budget ("OMB"), each of which combines two or more adjacent CBSAs that have substantial employment interchange.  "Combined Statistical Area" is a new definition not included in the prior rules and has the effect of expanding the area that may be served by a Community Credit Union to include adjacent CBSAs.  Under the Final Rule, a Combined Statistical Area could include multiple adjacent CBSAs while excluding the Core Area of each CBSA.  Accordingly, as written, a credit union may expand in two or more affluent contiguous suburbs in a Combined Statistical Area without including the Core Area of either CBSA, provided that the total population in the areas selected does not exceed 2.5 million.

(D)     A Community Credit Union with a current field of membership based on an SPJ or a Statistical Area (*e.g.*, a Core Based Statistical Area or a Combined Statistical Area) will be permitted to expand its geographic boundaries to add an "adjacent area," provided that: (a) the area is well-defined and the persons who live, work, worship, or attend school within the expanded community (*i.e.*, on both sides of the boundary separating the existing community and the adjacent area) have common interests and/or interaction; and (b) including the adjacent areas, the SPJ or Statistical Area, or a portion thereof, will have a population of 2.5 million or less.  Chartering and Field of Membership Manual, 81 Fed. Reg. at 88,415-88,416.

(E)     In the case of a field of membership based on a Rural District, the Final Rule permits a geographic area of any size within the state where the credit union maintains its headquarters and immediately contiguous states, as well as "bordering areas," provided the population does not exceed 1,000,000 and either more than 50% of the proposed district's population resides in rural areas, or the district has a population density of 100 persons or fewer per square mile.  *Id.* at 88,441. The potential for an increase in the area of a rural district could permit a Community Credit Union

to expand into vast sparsely populated areas that have traditionally been served by community banks.  The potential expansion into these areas by tax-advantaged credit unions would permit unfair competition and may result in reduced services and sale or consolidation of small community banks.

<u>Brief Point II</u>

THE FINAL RULE WILL HAVE A SUBSTANTIAL ADVERSE IMPACT ON COMMUNITY BANKS AND THE BANKING INDUSTRY.

Community banks nationwide are located within the field of membership of one or more state or federal credit unions.  Under the prior field of membership rules, both state and federal credit unions that pay no federal or state income tax were in a position to aggressively compete for banking business, including deposits, loans, fiduciary relationships, and other services.  The field of membership expansion in the Final Rule will dramatically increase the areas in which federal credit unions may operate, further tilting the regulatory playing field in favor of the tax-advantaged credit unions, and will permit credit unions to take further advantage of the new markets, economies of scale, and synergies that the expanded field of membership provides.  *Id.* at 88,440. In states with "wild card" statutes that give state-chartered credit unions the same powers as federal credit unions, state-chartered credit unions will also receive unfair advantages over community banks.

A credit union with a current field of membership based on an SPJ or a Statistical Area (*e.g.*, a Core Based Statistical Area or a Combined Statistical Area) will be permitted to expand its geographic boundaries to add an adjacent area, provided that: (a) the area is well-defined and the persons who live, work, worship, or attend school within the expanded community (*i.e.*, on both sides of the boundary separating the existing community and the bordering area) have common interests and/or interaction; and (b) the expanded SPJ or Statistical Area, or a portion thereof, will

8

have a population of 2.5 million or less. *Id.* at 88,442. For example, as shown later herein, a Community Credit Union that serves a field of membership including a portion of Minneapolis, Minnesota, together with Edina and Golden Valley, could now serve the more affluent suburbs of Minneapolis with a total population of 2.5 million or less without including the downtown or Core Area of the city. *See* Map attached as <u>Exhibit B</u>. This scenario is hardly a result consistent with the historic mission of credit unions, and simply ignores a credit union's statutory purpose of making credit available to people of modest means.

<u>Brief Point III</u>

EXCLUSION OF A CORE AREA FROM A CORE BASED STATISTICAL AREA CONTRAVENES CONGRESSIONAL INTENT.

Under the Final Rule, a Community Credit Union may serve a portion of a CBSA of up to 2.5 million people. Chartering and Field of Membership Manual, 81 Fed. Reg. at 88,440. Further, a Community Credit Union may also serve areas adjacent to a CBSA, so long as the Community Credit Union can show the adjacent area shares common interests with the CBSA. *Id.* at 88,415. Under the prior rules, a Community Credit Union was required to serve the core of the CBSA. *Id.* at 88,413. A CBSA's Core Area is practically defined as the "most populated county or named municipality in a CBSA's title." *Id.* The Final Rule provides that a Community Credit Union may serve a portion of a CBSA, even if the Community Credit Union does not serve its Core Area. *Id.* Furthermore, there is no requirement that the portions of the CBSA served by the Community Credit Union be contiguous. *Id.* at 88,440. Notably, the NCUA does not include the term "contiguous" or any variation thereof within the Final Rule's definition of "well-defined local community" as it relates to CBSAs. *Id.* Instead, the Final Rule provides that the well-defined community requirement is met if "[t]he area is a designated Core Based Statistical Area, or allowing a portion thereof, or in the case of a Core Based Statistical Area with Metropolitan

Divisions, the area is a Metropolitan Division or a portion thereof." *Id.*  Importantly, the Final

Rule does include the term "contiguous" in defining the term "rural district."  *See id.*  ("The

proposed district has well-defined, <u>contiguous</u> geographic boundaries.") (emphasis added).

Generally, "[w]hen an agency includes a requirement in only one section of a regulation, we

presume the exclusion from the remainder of the regulation to be intentional." *Smith v. Commr.*

*of Social Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *see also Russello v. United States*, 464 U.S. 16,

23, 104 S. Ct. 296, 78 L.Ed.2d 17 (1983) ("Where Congress includes particular language in one

section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion.").  Thus, the

NCUA's inclusion of the term "contiguous" in its definition of "rural districts" while excluding

the term "contiguous" from the definition of CBSA indicates that the exclusion of "contiguous"

was intentional and, therefore, the portions of CBSAs served by a Community Credit Union need

not be contiguous.

Consequently, a Community Credit Union may serve the most affluent portions of a CBSA,

while foregoing a Core Area or any other lower income areas, essentially gerrymandering a CBSA

to serve the more affluent communities within the CBSA.  By eliminating the requirement to serve

a CBSA's Core Area, the Final Rule contravenes the articulated Congressional intent that "Credit

unions . . . have the specified mission of meeting the credit and savings needs of consumers,

<u>especially of persons of modest means</u>."  CUMAA, Pub. L. No. 105-219, 112 Stat. 913 (1998)

(emphasis added); *see also First Nat. Bank and Trust Co. v. Nat. Credit Union Admin.*, 988 F.2d

1272, 1274 (D.C. Cir. 1993) ("the FCUA was designed to improve access to credit for people of

small means.")  This contravention of Congressional intent may be illustrated by the following

examples.

The Minneapolis-St. Paul-Bloomington, MN Metropolitan Statistical Area (the "Minneapolis CBSA")—a CBSA of more than three million people—consists of the core communities of Minneapolis and St. Paul.[1]  Minneapolis' median household income ("MHI") is $51,480 while St. Paul's MHI is $48,757.[2]  Comparatively, the MHI of the United States is $53,889.[3]  Therefore, the Minneapolis and St. Paul MHIs relative to the United States MHI demonstrates that the Minneapolis and St. Paul populations consist of individuals of modest means, as those persons' incomes, on average, are below the United States average income. Correspondingly, persons residing in Minneapolis and St. Paul are those persons that credit unions are intended to serve.  However, under the Final Rule, a Community Credit Union serving the Minneapolis CBSA could forego serving both Minneapolis and St. Paul; and instead, could serve the more affluent suburban areas of the Minneapolis CBSA, which include Eden Prairie (MHI of $97,640); Maple Grove (MHI of $92,680); Edina (MHI of $88,298); Plymouth (MHI of $85,418); Eagan (MHI of $82,265); Golden Valley (MHI of $81,534); and Minnetonka (MHI of $78,589), so long as the total population in the selected areas does not exceed 2.5 million.[4]  *See* Map attached as Exhibit B.

The Detroit-Warren-Dearborn, MI Metropolitan Statistical Area (the "Detroit CBSA") a CBSA of over four million people which consists largely of the core community of Detroit,

---

[1] *See* U.S. Census Bureau, *Annual Estimates of Resident Population: April 1, 2010 to July 1, 2016-United States-Metropolitan and Micropolitan Statistical Area; and for Puerto Rico, available at* https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last accessed June 1, 2017).
[2] *See* U.S. Census Bureau, *QuickFacts, available at* https://www.census.gov/quickfacts/table/PST045216/2758000,2743000,00 (last accessed June 1, 2017).
[3] *See* U.S. Census Bureau, *QuickFacts, available at* https://www.census.gov/quickfacts/table/PST045216/00 (last accessed June 1, 2017).
[4] *See* U.S. Census Bureau, *QuickFacts,* https://www.census.gov/quickfacts/table/PST045216/2717288,2751730,2740166,2718188,2718116; *see also* https://www.census.gov/quickfacts/table/PST045216/2743252,2724308.

provides another example of the Final Rule's contradiction of Congressional intent.[5] Unfortunately, the MHI of Detroit is $25,764, nearly half of the MHI of the United States.[6] Accordingly, persons living in Detroit constitute the exact base of people Congress intended credit unions to serve. Nonetheless, a Community Credit Union purporting to serve the Detroit CBSA could refrain from serving Detroit in its entirety; and, alternatively, could serve the wealthier suburban areas of Bloomfield Charter Township (MHI of $112,154); Birmingham (MHI of $108,135); West Bloomfield Charter Township (MHI of $91,028) Troy (MHI of $85,027); Canton Charter Township (MHI of $83,943); Novi (MHI of $82,587); Rochester Hills (MHI of $82,112); Farmington Hills (MHI of $71,609); and Livonia (MHI of $70,125).[7]

The Chicago-Naperville-Elgin Metropolitan Statistical Area (the "Chicago CBSA"), a CBSA of over seven million people, is made up of the core community of Chicago.[8] The MHI of Chicago is $48,522, well under the MHI of the United States.[9] As such, the citizens of Chicago qualify as persons of modest means. However, a credit union claiming to serve the Chicago CBSA could forego serving the Chicago core community. Rather, the credit union could serve the affluent suburban areas of Winnetka (MHI $211,773); Hinsdale (MHI of $162,722); Wilmette (MHI of $132,110); Highland Park (MHI of $122,829); Northbrook (MHI of $118,480);

---

[5] *See* U.S. Census Bureau, *Annual Estimates of Resident Population: April 1, 2010 to July 1, 2016-United States-Metropolitan and Micropolitan Statistical Area; and for Puerto Rico*, *available at* https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last accessed June 1, 2017)

[6] *See* U.S. Census Bureau, *QuickFacts*, *available at* https://www.census.gov/quickfacts/table/PST045216/2622000 (last accessed June 1, 2017).

[7] *See* U.S. Census Bureau, *QuickFacts*, *available at* https://www.census.gov/quickfacts/table/PST045216/2659440,2616313120,2680700,2612585480,2608640,2612509110; https://www.census.gov/quickfacts/table/PST045216/2649000,2627440,2669035 (last accessed June 1, 2017).

[8] *See* U.S. Census Bureau, *Annual Estimates of Resident Population: April 1, 2010 to July 1, 2016-United States-Metropolitan and Micropolitan Statistical Area; and for Puerto Rico*, *available at* https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last accessed June 1, 2017).

[9] *See* U.S. Census Bureau, *QuickFacts*, *available at* https://www.census.gov/quickfacts/table/PST045216/1714000 (last accessed June 1, 2017).

Naperville (MHI of $109,468); Elmhurst (MHI of $96,486); Lincolnwood (MHI of $94,329); Glenview (MHI of $93,240); and Park Ridge (MHI of $90,484).[10]

The St. Louis-St. Charles-Farmington Metropolitan Statistical Area (the "St. Louis CBSA"), a CBSA of nearly 3 million people, includes the core community of St. Louis.[11]  St. Louis's MHI is $35,599, much lower than the MHI of the United States.[12]  Consequently, persons living in the St. Louis core community are persons of modest means.  Notwithstanding the foregoing, a credit union purporting to serve the St. Louis CBSA would be able to exclude St. Louis from its member area and, instead, serve the wealthy areas of Ladue (MHI of $182,875); Town and Country (MHI of $161,477); Creve Coeur (MHI of $96,061); Chesterfield (MHI of $93,270); Clayton (MHI of $93,009); Webster Groves (MHI of $88,388); Ballwin (MHI of $87,373); Kirkwood (MHI of $77,574); and Manchester (MHI of $76,395).[13]

Clearly, the above examples demonstrate that, by eliminating the requirement to serve the Core Area of the community in the Final Rule, the Board has contravened the articulated Congressional intent that Community Credit Unions serve those persons of "modest means". Accordingly, the Final Rule is unreasonable, unlawful, arbitrary and capricious and should be vacated.

---

[10] See U.S. Census Bureau, *QuickFacts*, *available at*
https://www.census.gov/quickfacts/table/PST045216/1751622,1753481,1734722,1782075,1735307,1782530;
https://www.census.gov/quickfacts/table/PST045216/1757875,1729938,1743744,1723620 (last accessed June 1, 2017).
[11] See U.S. Census Bureau, *Annual Estimates of Resident Population: April 1, 2010 to July 1, 2016-United States-Metropolitan and Micropolitan Statistical Area; and for Puerto Rico*, *available at*
https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last accessed June 1, 2017).
[12] See U.S. Census Bureau, *QuickFacts*, *available at*  https://www.census.gov/quickfacts/table/PST045216/2965000 (last accessed June 1, 2017).
[13] See U.S. Census Bureau, *QuickFacts*, *available at*
https://www.census.gov/quickfacts/table/PST045216/2978154,2914572,2913600,2917272,2973618,2939656;
https://www.census.gov/quickfacts/table/PST045216/2945668,2939044,2903160 (last accessed June 1, 2017).

Brief Point IV

THE FINAL RULE UNREASONABLY EXPANDS "RURAL DISTRICTS."

According to the Final Rule, "[a]n area of <u>any geographic size</u> qualifies as a Rural District

if:

- The proposed district has well-defined, contiguous geographic boundaries;
- The total population of the proposed district does not exceed 1,000,000;
- Either more than 50% of the proposed district's population resides in census blocks or other geographic units that are designated as rural by the Consumer Finance Protection Bureau or the United States Census Bureau, OR the district has a population density of 100 persons or fewer per square mile; and
- The boundaries of the well-defined rural district do not exceed the outer boundaries of the states that are immediately contiguous to the state in which the credit union maintains its headquarters (i.e., not to exceed the outer perimeter of the layer of states immediately surrounding the headquarters state)."

*See* Chartering and Field of Membership Manual, 81 Fed. Reg. at 88,440 (emphasis added).  The

Final Rule's definition of "rural districts" expands a rural district to include vast areas

encompassing several states, so long as the population is less than 1,000,000 and has at least 50%

of its population living in census blocks or geographic units that are designated as rural, or the

population density is less than 100 persons per square mile.  *Id.*

Based on the above definition of rural district, the entire states of Alaska, North Dakota,

South Dakota, Vermont, and Wyoming qualify as34 rural districts.[14] Included within the above

states' rural districts are cities such as Anchorage, Alaska, and Sioux Falls, South Dakota, whose

populations are 298,695 and 171,544, respectively.[15] In fact, both Anchorage and Sioux Falls are

---

[14] *See* U.S. Census Bureau, *QuickFacts*, *available at*
https://www.census.gov/quickfacts/table/PST045216/02,38,46,50,56,00 (last accessed June 1, 2017).
[15] *See* U.S. Census Bureau, *QuickFacts*, *available at*
https://www.census.gov/quickfacts/table/PST045216/4659020,0203000 (last accessed June 1, 2017).

classified as "Metropolitan Statistical Areas" by the United States Census Bureau.[16] These major metropolitan areas cannot and should not be classified as "rural" under the Final Rule.  The term "rural" has been defined to mean "of or relating to the country, country people or life, or agriculture";[17] or, similarly "living in the country."[18]  Antonyms of rural include metropolitan, urban, city, and suburban.[19]  As such, the NCUA's definition of "rural" includes metropolitan areas which are paradoxically contradictory to the commonly accepted definitions of the term "rural".  Accordingly, the NCUA's inclusion of metropolitan areas that are literally defined to mean the opposite of "rural" within the term "rural district" is unreasonable, arbitrary and capricious.

The figure below details five potential rural districts that, due to the relatively low population densities of various portions of the western United States, would encompass large areas of several states.  A statistical summary of United States Census data regarding the population and square mile area of the various counties that make up each district below is attached hereto as Exhibit C and incorporated by this reference.

---

[16] *See* U.S. Census Bureau, *Annual Estimates of Resident Population: April 1, 2010 to July 1, 2016-United States-Metropolitan and Micropolitan Statistical Area; and for Puerto Rico*, *available at* https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last accessed June 1, 2017).

[17] Merriam-Webster Dictionary Online, *Rural*, *available at*  https://www.merriam-webster.com/dictionary/rural (last accessed June 1, 2017).

[18] Dictionary.com, *Rural*, *available at*  http://www.dictionary.com/browse/rural?s=t (last accessed June 1, 2017).

[19] Thesaurus.com., *Rural*, *available at* http://www.thesaurus.com/browse/rural?s=t (last accessed June 1, 2017).



As shown in the above figure in orange, a Community Credit Union located in Northern Nevada could serve a rural district that includes much of Nevada, Northern California, Eastern Oregon, Southern Idaho, and Western Utah (the "Nevada District"). The Nevada District contains a population of approximately 975,246 people. Because the Nevada District's population is less than one million people, is contiguous, and has a population density of less than 100 people per square mile, the Nevada District would qualify as a rural district under the Final Rule. Therefore, the Nevada District, which encompasses five states and approximately 181,795.61 square miles,

would qualify as a single rural district.  Notably, the state of California, the third largest state, is only 155,799.22 square miles in area.[20]

As shown in yellow above, a Community Credit Union located in Northern Arizona could potentially have a rural district that includes portions of Northern Arizona, Eastern Nevada, Southern Utah, Southwestern Colorado and Northwestern New Mexico within its rural district (the "Northern Arizona District").  The city of Flagstaff, Arizona, with a population of 70,320, would be located in the Northern Arizona District.[21]  Since the Northern Arizona District's population is less than one million people, is contiguous, and has a population density of less than 100, the Northern Arizona District would qualify as a rural district under the Final Rule.  Thus, pursuant to the expansive definition of rural district, the Northern Arizona District which contains a population of 999,454, includes five states and spans 104,341.75 square miles, would qualify as a single rural district.

As shown in blue above, a Community Credit Union located in Wyoming could have a rural district that includes the entire state of Wyoming, Eastern Idaho, Southern Montana, Western South Dakota, Western Nebraska, Northwestern Colorado and Northeastern Utah (the "Wyoming District").  Although the Wyoming District would include seven states, a population of 995,580 people, and stretch over 181,676 square miles, because the Wyoming District has less than one million people, is contiguous, and has a population density of less than 100 people per square mile, the Wyoming District would qualify as a rural district under the Final Rule.

As shown in purple above, a Community Credit Union located in Western Oklahoma could serve a rural district that encompasses Western Oklahoma, Northern Texas, Eastern New Mexico,

---

[20] *See* U.S. Census Bureau, *QuickFacts*, *available at* https://www.census.gov/quickfacts/table/PST045216/06 (last accessed June 1, 2017).
[21] *See* U.S. Census Bureau, *QuickFacts*, *available at*  https://www.census.gov/quickfacts/table/PST045216/0423620 (last accessed June 1, 2017).

Eastern Colorado, and Western Kansas (the "<u>Western Oklahoma District</u>").   The Western Oklahoma District includes a population of 998,820 people, 117,659.79 square miles, and portions of five states.   Further, the Western Oklahoma District includes the city of Amarillo, Texas, which is classified as a CBSA that has a population of nearly 257,578 in the aggregate.[22]   However, due to the expansive definition of rural district under the Final Rule, because the Western Oklahoma District's population is less than one million, is contiguous, and has a population density of less than 100 people per square mile, the Western Oklahoma District would qualify as a rural district under the Final Rule.

Finally, as shown in red above, a Community Credit Union located in Western Nebraska's rural district could be comprised of Western Nebraska, Western Kansas, Eastern Colorado, Eastern Wyoming, and Southern South Dakota (the "<u>Western Nebraska District</u>").   Although the Western Nebraska District contains an approximate population of 977,606,spans five states and includes 151,698.15 square miles in area, because the Western Nebraska District's population is less than one million people, is contiguous, and has a population density of less than 100 people per square mile, the Western Nebraska District would qualify as a rural district under the Final Rule.

As illustrated above, the Final Rule's expansive definition of a rural district is manifestly unreasonable and provides an unfair competitive advantage to credit unions in rural districts. Generally speaking, rural areas, especially in the western portion of the United States, have been largely served by small rural community banks.   However, by reason of the Final Rule's far-reaching rural district definition, these small rural community banks would be required to compete with potentially large credit unions that have an unfair competitive advantage due to their tax

---

[22] *See* U.S. Census Bureau, *Annual Estimates of Resident Population: April 1, 2010 to July 1, 2016-United States-Metropolitan and Micropolitan Statistical Area; and for Puerto Rico*, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last accessed June 1, 2017).

exempt status.  Further, because of their ability to serve much larger groups of persons, credit unions located in large rural districts (*i.e.*, a district that encompasses several states and nearly one million people) will have far greater resources than small rural community banks, thereby resulting in additional unfair competitive advantage.  As a result of the foregoing unfair competitive advantages, credit union competition in the Final Rule's expanded rural districts could lead to the closure or consolidation of numerous small rural community banks due to an inability to compete with larger, tax exempt credit unions.

<div align="center">Brief Point V</div>

THE FINAL RULE MAY CAUSE STATE CREDIT UNIONS TO CONVERT TO FEDERAL CREDIT UNIONS.

Some states have state laws and regulations applicable to state-chartered credit unions that do not have "wild card" provisions, *i.e.*, laws that give state-chartered credit unions the same powers as federal credit unions.  For example, Iowa does not have a "wild card" statute.  The Iowa Legislature expressed an intent that credit unions serve specific credit needs of Iowans.  *See*, *e.g.*, Iowa Code § 533.202 (restricting the field of membership for Iowa credit unions to groups of individuals that have a common bond of association such as, but not limited to, occupation, common employer, or residence within specified geographic boundaries).  Generally, those state credit union laws have been enacted to meet the particular credit needs of the citizens of that state.  Because of membership limitations under state law and the far-reaching expansion of fields of membership under the Final Rule, state-chartered credit unions may consider conversion to federal credit unions.  As a result, the number of state-chartered credit unions and the need for state credit union laws may be reduced, as federal credit unions under the Final Rule will benefit from a distinct membership advantage over many of their state-chartered competitors.  The expansion of Community Credit Unions under the Final Rule beyond the local community common-bond

<div align="center">19</div>

concept intended by Congress in the FCUA does not further the availability of credit to satisfy the local credit needs of the citizens of each state.

<u>Brief Point VI</u>

THE NCUA'S DEFINITIONS OF "WELL-DEFINED LOCAL COMMUNITY" AND "RURAL DISTRICT" ARE NOT ENTITLED TO CHEVRON DEFERENCE.

Generally, the NCUA's interpretation of the FCUA, specifically 12 U.S.C. § 1759(b), would be entitled to *Chevron* deference. *Chevron, U.S.A. Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984). In reviewing an agency's construction of a statute, the court must first determine whether Congress has directly spoken to the precise question at issue. *Id.* If the intent of Congress is clear, the court, as well as the agency, must give effect to the unambiguously express intent of Congress. *Id.* With respect to the intent of Congress as it pertains to credit unions, Congress has stated that "[t]he American credit union movement began as a cooperative effort to serve the productive and provident credit needs of individuals of modest means." CUMAA, Pub. L. No. 105-219, 112 Stat. 913 (1998). Further, Congress has stated that "[c]redit unions . . . have the specified mission of meeting the credit and savings needs of consumers, <u>especially of persons of modest means</u>." *Id.*; *see also First Nat. Bank and Trust Co.* 988 F.2d at 1274 ("the FCUA was designed to improve access to credit for people of small means.") Therefore, Congress has clearly expressed the intent for credit unions to serve persons of modest means. However, as shown above, the portion of the NCUA's Final Rule relating to fields of membership that allows a credit union to exclude Core Areas and individuals of modest means from its membership area is in direct conflict with the express Congressional intent and, therefore, is not entitled to *Chevron* deference.

If a statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A. Inc.*, 467 U.S. at 842. Stated differently, "where a statute is ambiguous, the question is whether in doing so, the agency has acted reasonably and thus "stayed within the bounds of its statutory authority." *Utility Air Regulatory Group v. E.P.A.*, — U.S. —, 134 S. Ct. 2427, 2439, 189 L.Ed.2d 372 (2014). Notably, the presence of some statutory uncertainty does not cover virtually any interpretation of a statute. *Cuomo v. Clearing House Assn., L.L.C.*, 557 U.S. 519, 525, 129 S.Ct. 2710, 174 L.Ed.2d 464 (2009). Instead, even under *Chevron's* deferential framework, agencies must operate "within the bounds of reasonable interpretation." *City of Arlington, Tex. v. F.C.C.*, — U.S. —, 133 S.Ct. 1863, 1868, 185 L.Ed.2d 941 (2013). Indeed, deference is not paid to agency interpretation if it is arbitrary, capricious or manifestly contrary to the statute. *Whitehead Street, Inc. v. Secretary of U.S. Dept. of Agriculture*, 701 F.3d 1345 (11th Cir. 2012).

The terms "arbitrary" and "capricious" have been defined as an act done without adequate determining principle or not done according to reason or judgment. *First Nat. Bank of Fayetteville v. Smith*, 365 F.Supp. 898, 903 (W.D. Ark. 1973), *rev'd on other grounds*, 508 F.2d 1371 (8th Cir. 1974). Here, although Congress has given the NCUA the power to adopt definitions, the Final Rule's definitions of "well-defined local community" and "rural district" are neither within the bounds of the statutory authority of the NCUA nor within the bounds of reasonable interpretation.

As shown above, the definition of "well-defined local community" not only permits fields of membership to cover suburban areas that are not geographically connected, it permits the exclusion of Core Areas, the very areas that Community Credit Unions operating under the NCUA were designed to serve. In addition, under the Final Rule's definition, a "rural district" could contain parts of up to seven states and could also include major metropolitan areas such as Amarillo, Texas, Sioux Falls, South Dakota, or Anchorage, Alaska. As such, the Final Rule's

definition of a "rural district" is manifestly unreasonable, arbitrary and capricious, as it allows for vast areas that span multiple states and include major metropolitan areas to be considered rural. Because the definitions of "well-defined local community" and "rural district" are unreasonable, arbitrary and capricious, the action of the NCUA in adopting the definitions is not entitled to any deference by the court.

<u>Brief Point VII</u>

GIVEN EXCLUSION FROM THE COMMUNITY REINVESTMENT ACT, THE FINAL RULE'S DELETION OF "CORE AREA" FROM THE DEFINITION OF CORE BASED STATISTICAL AREA ENABLES CREDIT UNIONS TO IGNORE CONGRESSIONAL INTENT THAT CREDIT UNIONS PROVIDE CREDIT TO PEOPLE OF MODEST MEANS AND PROVIDES A FURTHER COMPETITIVE ADVANTAGE OVER COMMUNITY BANKS.

The Community Reinvestment Act ("CRA"), 12 U.S.C. § 2901 *et seq.*, was enacted by Congress in 1977 to encourage depository institutions to meet the credit needs of the communities in which they operate, including low and moderate income areas. The CRA is implemented by 12 C.F.R. parts 25, 228, 345 and 195. Under the CRA and supporting regulations, banks are examined for compliance and receive ratings. An unsatisfactory rating may prevent a bank from engaging in certain activities, including, without limitation, mergers, acquisitions and establishment of offices. 12 C.F.R. § 228.29.

Credit unions are not subject to the CRA. Accordingly, they may operate without the regulatory burden, record retention, and expense required to comply with the CRA. Without CRA regulation and with the deletion of the prior requirement that Community Credit Unions serve the Core Area of a CBSA in the Final Rule, Community Credit Unions may establish fields of membership designed to serve only affluent areas and completely omit adjacent Core Areas where persons of modest means reside.

Under the Final Rule, Community Credit Unions are permitted to expand into larger geographic areas on a tax-advantaged basis without regard to their statutory mandate "to make more available to people of small means credit for provident purposes", FCUA, Pub. L. 73-467, 48 Stat. 1216 (1934), and without the regulatory burden or expense of the CRA. This result further demonstrates that the definitions of "well-defined local community" and "rural district" in the Final Rule exceed the statutory powers of the NCUA, are arbitrary and capricious, and violate the intent of the FCUA.

CONCLUSION

By granting to the Board the authority to define the fields of membership of Community Credit Unions, Congress has relied upon the NCUA to adopt definitions that serve the specific intent of the FCUA that "credit unions … have the specified mission of meeting the credit and savings needs of consumers, especially persons of modest means."  In its definitions of "well-defined local community" and "rural district", the Board has clearly exceeded its statutory authority.  By adopting definitions that permit a Community Credit Union to operate in affluent areas that completely exclude adjacent Core Areas, the Board may permit Community Credit Unions to adopt fields of membership that completely ignore the credit and savings needs of persons of modest means.  With the benefit of their tax advantage[23] and without having to comply with the requirements of the CRA, Community Credit Unions may operate with less expense and regulatory burden than community banks, which further expands the competitive advantage of credit unions.  The Final Rule will enable large credit unions to grow even larger and expand their commercial lending activities and other services that do not relate to "persons of modest means," activities and services generally provided by community banks.

---

[23] The credit union tax exception is estimated by the U.S. Treasury Department to cost the federal government $35.3 billion over the next decade.  *See American Banker*, Vol. 182, No. 101, p. 2, May 26, 2017.

The same is true of the Board's definition of "rural districts".  A large credit union in a rural district, as defined in the Final Rule, pays no federal or state income tax, is not subject to the CRA, and may have such a competitive advantage that community banks in the area may be required to close or consolidate resulting in reduced competition and reduced banking services in expansive rural areas.

The Final Rule is simply a further effort by the NCUA to expand the power and competitive advantages of federal credit unions.  However, in doing so, the Board has adopted definitions of "well-defined local community" and "rural district" that may not in fact be "clearly defined" and are certainly not "local".  The portion of the Final Rule that relates to fields of membership is arbitrary and capricious and results from the Board exceeding its statutory authority.  Accordingly, the NCUA should be enjoined from implementing or enforcing the field of membership provisions of the Final Rule.

Dated this 2nd day of June, 2017.

<div style="margin-left: 50%;">

*/s/ Julie Johnson McLean*
Robert A. Gamble (AT#0002809)
Julie Johnson McLean (AT#0005185)
Davis Brown Law Firm
215 10th Street, Suite 1300
Des Moines, IA  50309
Telephone: (515) 288-2500
Facsimile:  (515) 243-0654
Email:   beaugamble@davisbrownlaw.com
           juliemclean@davisbrownlaw.com

*/s/ Steven D. Gordon*
Frank A. Keating
Steven D. Gordon
Holland & Knight LLP
800 17th Street N.W., Suite 1100
Washington, DC  20006
Telephone: (202) 955-3000
Facsimile:  (202) 955-5564

</div>

CERTIFICATE OF SERVICE

On the 2nd day of June, 2017, the undersigned served copies of the foregoing Amicus Curiae Brief to which this Certificate is attached via CM/ECF, which will send notification of such filing to the following counsel who have appeared in this case:

Robert A. Long, Jr.
Andrew Soukup
Philip Levitz
Covington & Burling LP
One City Center
850 Tenth Street, NW
Washington, DC 20001
ATTORNEY FOR PLAINTIFF AMERICAN BANKERS ASSOCIATION

Chad A. Readler, Acting Assistant Attorney General
Lesley Farby, Assistant Director
Andrew M. Bernie, Trial Attorney
U.S. Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC  20530
ATTORNEYS FOR NATIONAL CREDIT UNION ADMINISTRATION

/s/      Steven D. Gordon

# EXHIBIT A
## LIST OF ADDITIONAL BANKERS ASSOCIATIONS

1. Alabama Bankers Association
2. Alaska Bankers Association
3. Arizona Bankers Association
4. Arkansas Bankers Association
5. California Bankers Association
6. Colorado Bankers Association
7. Connecticut Bankers Association
8. Delaware Bankers Association
9. Florida Bankers Association
10. Georgia Bankers Association
11. Hawaii Bankers Association
12. Idaho Bankers Association
13. Illinois League of Financial Institutions
14. Illinois Bankers Association
15. Indiana Bankers Association
16. Kansas Bankers Association
17. Kentucky Bankers Association
18. Louisiana Bankers Association
19. Maine Bankers Association
20. Maryland Bankers Association
21. Massachusetts Bankers Association
22. Michigan Bankers Association
23. Minnesota Bankers Association
24. Mississippi Bankers Association
25. Missouri Bankers Association
26. Montana Bankers Association
27. Nebraska Bankers Association
28. Nevada Bankers Association
29. New Hampshire Bankers Association
30. New Jersey Bankers Association
31. New Mexico Bankers Association
32. New York Bankers Association
33. North Carolina Bankers Association
34. North Dakota Bankers Association
35. Ohio Bankers League
36. Oklahoma Bankers Association
37. Oregon Bankers Association
38. Pennsylvania Bankers Association
39. Rhode Island Bankers Association
40. South Carolina Bankers Association
41. South Dakota Bankers Association
42. Tennessee Bankers Association
43. Texas Bankers Association
44. Utah Bankers Association
45. Vermont Bankers Association
46. Virginia Bankers Association
47. Washington Bankers Association
48. West Virginia Bankers Association
49. Wisconsin Bankers Association
50. Wyoming Bankers Association



EXHIBIT

B

**EXHIBIT C**
**COUNTY POPULATION AND SQUARE MILEAGE**

| County | State | Population | Square Miles |
|---|---|---|---|
| **NEVADA DISTRICT** | | | |
| Humboldt | Nevada | 16,842 | 9,640.76 |
| Elko | Nevada | 52,168 | 17,169.83 |
| Washoe | Nevada | 212,171 (excluding Reno) | 6,199.27 |
| Lander | Nevada | 5,702 | 5,490.11 |
| Eureka | Nevada | 1,917 | 4,175.68 |
| Lincoln | Nevada | 5,055 | 10,633.20 |
| White Pine | Nevada | 9,682 | 8,875.65 |
| Churchill | Nevada | 24,198 | 4,930.46 |
| Pershing | Nevada | 6,560 | 6,036.56 |
| Klamath | Oregon | 66,443 | 5,941.05 |
| Lake | Oregon | 7,837 | 8,138.98 |
| Malheur | Oregon | 30,439 | 9,887.53 |
| Harney | Oregon | 7,292 | 10,133.17 |
| Grant | Oregon | 7,158 | 4,528.54 |
| Baker | Oregon | 16,059 | 3,068.36 |
| Union | Oregon | 26,087 | 2,036.61 |
| Wallowa | Oregon | 6,946 | 3,146.19 |
| Owyhee | Idaho | 11,389 | 7,665.51 |
| Payette | Idaho | 23,026 | 406.87 |
| Washington | Idaho | 10,172 | 1,452.98 |
| Adams | Idaho | 3,900 | 1,363.06 |
| Gem | Idaho | 17,184 | 560.90 |
| Twin Falls | Idaho | 83,514 | 1,921.21 |
| Cassia | Idaho | 23,504 | 2,565.08 |
| Box Elder | Utah | 53,139 | 5,745.55 |
| Tooele | Utah | 64,833 | 6,941.35 |
| Juab | Utah | 11,010 | 3,392.28 |
| Millard | Utah | 12,694 | 6,572.43 |
| Beaver | Utah | 6,493 | 2,589.88 |
| Iron | Utah | 49,937 | 3,296.68 |
| Lassen | California | 30,870 | 4,541.18 |
| Plumas | California | 18,627 | 2,553.04 |
| Modoc | California | 8,795 | 3,917.77 |
| Siskiyou | California | 43,603 | 6,277.89 |
| **TOTAL** | | 975,246 | 181,795.61 |
| | | | |
| **ARIZONA DISTRICT** | | | |
| Lincoln | Nevada | 5,055 | 10,633.20 |

1

| County | State | Population | Square Miles |
|--------|-------|-----------|--------------|
| Coconino | Arizona | 140,908 | 18,618.89 |
| **County** | **State** | **Population** | **Square Miles** |
| Mohave | Arizona | 205,249 | 13,311.08 |
| Montezuma | Colorado | 26,999 | 2,029.53 |
| Dolores | Colorado | 2,056 | 1,067.05 |
| San Miguel | Colorado | 8,017 | 1,286.61 |
| Montrose | Colorado | 41,471 | 2,240.70 |
| La Plata | Colorado | 55,623 | 1,692.08 |
| Hinsdale | Colorado | 788 | 1,117.25 |
| Archuleta | Colorado | 12,854 | 1,350.18 |
| San Juan | New Mexico | 115,079 | 5,513.07 |
| McKinley | New Mexico | 74,923 | 5,449.81 |
| Cibola | New Mexico | 27,487 | 4,539.48 |
| Rio Arriba | New Mexico | 40,040 | 5,860.84 |
| Catron | New Mexico | 3,508 | 6,923.60 |
| Washington | Utah | 160,245 | 2,426.36 |
| Iron | Utah | 49,937 | 3,296.68 |
| Kane | Utah | 7,334 | 3,990.23 |
| San Juan | Utah | 16,895 | 7,819.99 |
| Garfield | Utah | 4,986 | 5,175.12 |
| **TOTAL** | | 999,454 | 104,341.75 |
| | | | |
| **OKLAHOMA DISTRICT** | | | |
| Beaver | Oklahoma | 5,382 | 1,814.67 |
| Texas | Oklahoma | 21,098 | 2,041.26 |
| Cimarron | Oklahoma | 2,162 | 1,834.74 |
| Harper | Oklahoma | 3,717 | 1,039.02 |
| Ellis | Oklahoma | 4,080 | 1,231.52 |
| Roger Mills | Oklahoma | 3,640 | 1,141.14 |
| Beckham | Oklahoma | 22,519 | 901.81 |
| Harmon | Oklahoma | 2,704 | 537.19 |
| Greer | Oklahoma | 5,998 | 639.32 |
| Jackson | Oklahoma | 25,497 | 802.65 |
| Kiowa | Oklahoma | 9,077 | 1,015.23 |
| Tillman | Oklahoma | 7,465 | 871.13 |
| Washita | Oklahoma | 11,447 | 1,003.17 |
| Custer | Oklahoma | 29,293 | 988.82 |
| Dewey | Oklahoma | 4,819 | 999.48 |
| Woodward | Oklahoma | 20,814 | 1,242.40 |
| Woods | Oklahoma | 9,201 | 1,286.45 |
| Alfalfa | Oklahoma | 5,827 | 866.46 |
| Major | Oklahoma | 7,772 | 954.99 |
| Potter | Texas | 120,832 | 908.37 |

| County | State | Population | Square Miles |
|--------|-------|-----------|--------------|
| Carson | Texas | 6,057 | 920.22 |
| Gray | Texas | 22,725 | 925.97 |
| Wheeler | Texas | 5,546 | 914.52 |
| **County** | **State** | **Population** | **Square Miles** |
| Collingsworth | Texas | 3,016 | 918.44 |
| Donley | Texas | 3,405 | 926.89 |
| Armstrong | Texas | 1,876 | 909.11 |
| Randall | Texas | 132,501 | 911.54 |
| Lipscomb | Texas | 3,487 | 932.18 |
| Ochiltree | Texas | 10,306 | 917.63 |
| Hansford | Texas | 5,538 | 919.81 |
| Sherman | Texas | 3,068 | 923.04 |
| Dallam | Texas | 7,056 | 1,503.26 |
| Hartley | Texas | 5,747 | 1,462.03 |
| Moore | Texas | 22,120 | 899.69 |
| Hutchinson | Texas | 21,511 | 887.42 |
| Roberts | Texas | 916 | 924.06 |
| Hemphill | Texas | 4,129 | 906.29 |
| Oldham | Texas | 2,076 | 1,500.53 |
| Deaf Smith | Texas | 18,830 | 1,496.87 |
| Union | New Mexico | 4,183 | 1,066.18 |
| Quay | New Mexico | 8,365 | 2,874.35 |
| Harding | New Mexico | 665 | 2,125.44 |
| Mora | New Mexico | 4,504 | 1,931.27 |
| Colfax | New Mexico | 12,253 | 3,758.06 |
| San Miguel | New Mexico | 27,760 | 4,715.82 |
| Taos | New Mexico | 33,065 | 2,203.11 |
| Costilla | Colorado | 3,721 | 1,226.95 |
| Huerfano | Colorado | 6,677 | 1,591.00 |
| Custer | Colorado | 4,602 | 738.63 |
| Las Animas | Colorado | 14,103 | 4,772.67 |
| Otero | Colorado | 18,295 | 1,261.96 |
| Bent | Colorado | 5,861 | 1,512.86 |
| Prowers | Colorado | 11,922 | 1,638.40 |
| Crowley | Colorado | 5,694 | 787.42 |
| Kiowa | Colorado | 1,373 | 1,767.77 |
| Lincoln | Colorado | 5,643 | 2,577.63 |
| Cheyenne | Colorado | 1,848 | 1,778.28 |
| Kit Carson | Colorado | 8,195 | 2,160.82 |
| Washington | Colorado | 4,908 | 2,518.03 |
| Yuma | Colorado | 10,103 | 2,364.41 |
| Cheyenne | Kansas | 2,661 | 1,019.89 |
| Rawlins | Kansas | 2,549 | 1,069.42 |

| County | State | Population | Square Miles |
|---|---|---|---|
| Sherman | Kansas | 5,965 | 1,056.07 |
| Thomas | Kansas | 7,892 | 1,074.69 |
| Wallace | Kansas | 1,497 | 913.65 |
| Logan | Kansas | 2,831 | 1,072.99 |
| Greeley | Kansas | 1,296 | 778.45 |
| **County** | **State** | **Population** | **Square Miles** |
| Wichita | Kansas | 2,112 | 718.57 |
| Hamilton | Kansas | 2,536 | 996.51 |
| Kearny | Kansas | 3,917 | 870.54 |
| Stanton | Kansas | 2,062 | 680.35 |
| Grant | Kansas | 7,646 | 574.80 |
| Morton | Kansas | 2,848 | 729.73 |
| Stevens | Kansas | 5,584 | 727.29 |
| Haskell | Kansas | 4,006 | 577.52 |
| Seward | Kansas | 22,709 | 639.50 |
| Meade | Kansas | 4,216 | 978.09 |
| Decatur | Kansas | 2,832 | 893.52 |
| Sheridan | Kansas | 2,509 | 895.96 |
| Gove | Kansas | 2,589 | 1,071.67 |
| Scott | Kansas | 5,032 | 717.54 |
| Lane | Kansas | 1,636 | 717.46 |
| Finney | Kansas | 36,722 | 1,301.97 |
| Gray | Kansas | 6,034 | 868.87 |
| Norton | Kansas | 5,493 | 878.13 |
| Graham | Kansas | 2,564 | 898.52 |
| Trego | Kansas | 2,872 | 889.48 |
| Ness | Kansas | 2,962 | 1,074.75 |
| Hodgeman | Kansas | 1,870 | 859.99 |
| Ford | Kansas | 33,971 | 1,098.27 |
| Clark | Kansas | 2,072 | 974.63 |
| Comanche | Kansas | 1,862 | 788.30 |
| Kiowa | Kansas | 2,483 | 722.64 |
| Edwards | Kansas | 2,938 | 621.89 |
| Rush | Kansas | 3,058 | 717.76 |
| **TOTAL** | | 998,820 | 117,659.79 |
| | | | |
| **WYOMING DISTRICT** | | | |
| Wyoming | Wyoming | 585,501 | 97,093.14 |
| Jackson | Colorado | 1,357 | 1,613.72 |
| Routt | Colorado | 24,648 | 2,362.03 |
| Moffat | Colorado | 13,109 | 4,743.29 |
| Rio Blanco | Colorado | 6,545 | 3,220.93 |
| Grand | Utah | 9,579 | 3,671.54 |

4

| County | State | Population | Square Miles |
|---|---|---|---|
| Uintah | Utah | 36,373 | 4,479.69 |
| Daggett | Utah | 1,095 | 696.98 |
| Duchesne | Utah | 20,337 | 3,240.95 |
| Summit | Utah | 40,307 | 1,871.71 |
| Rich | Utah | 2,319 | 1,028.78 |
| Morgan | Utah | 11,437 | 609.20 |
| Oneida | Idaho | 4,343 | 1,200.06 |
| **County** | **State** | **Population** | **Square Miles** |
| Franklin | Idaho | 13,406 | 663.65 |
| Bear Lake | Idaho | 5,945 | 974.79 |
| Caribou | Idaho | 6,887 | 1,764.15 |
| Fremont | Idaho | 12,943 | 1,863.53 |
| Clark | Idaho | 860 | 1,764.19 |
| Beaverhead | Montana | 9,401 | 5,541.62 |
| Madison | Montana | 7,924 | 3,587.48 |
| Park | Montana | 16,114 | 2,803.06 |
| Carbon | Montana | 10,460 | 2,048.79 |
| Big Horn | Montana | 13,343 | 4,995.46 |
| Powder River | Montana | 1,746 | 3,297.30 |
| Carter | Montana | 1,203 | 3,340.75 |
| Harding | South Dakota | 1,278 | 2,671.38 |
| Butte | South Dakota | 10,205 | 2,249.90 |
| Lawrence | South Dakota | 25,281 | 800.04 |
| Custer | South Dakota | 8,596 | 1,557.00 |
| Fall River | South Dakota | 6,849 | 1,739.92 |
| Dawes | Nebraska | 8,979 | 1,396.46 |
| Sioux | Nebraska | 1,242 | 2,066.74 |
| Box Butte | Nebraska | 11,194 | 1,075.29 |
| Scotts Bluff | Nebraska | 36,422 | 739.40 |
| Morrill | Nebraska | 4,787 | 1,423.84 |
| Cheyenne | Nebraska | 10,051 | 1,196.29 |
| Banner | Nebraska | 798 | 746.11 |
| Kimball | Nebraska | 3,679 | 951.85 |
| Sheridan | Nebraska | 5,234 | 2,440.86 |
| Garden | Nebraska | 1,930 | 1,704.28 |
| Deuel | Nebraska | 1,873 | 439.85 |
| **TOTAL** | | 995,580 | 181,676.00 |
| | | | |
| **NEBRASKA DISTRICT** | | | |
| Dawes | Nebraska | 8,979 | 1,396.46 |
| Sioux | Nebraska | 1,242 | 2,066.74 |
| Box Butte | Nebraska | 11,194 | 1,075.29 |
| Scotts Bluff | Nebraska | 36,422 | 739.40 |

| | | | |
|---|---|---|---|
| Morrill | Nebraska | 4,787 | 1,423.84 |
| Cheyenne | Nebraska | 10,051 | 1,196.29 |
| Banner | Nebraska | 798 | 746.11 |
| Kimball | Nebraska | 3,679 | 951.85 |
| Sheridan | Nebraska | 5,234 | 2,440.86 |
| Garden | Nebraska | 1,930 | 1,704.28 |
| Deuel | Nebraska | 1,873 | 439.85 |
| Cherry | Nebraska | 5,832 | 5,960.42 |
| Grant | Nebraska | 641 | 776.22 |
| **County** | **State** | **Population** | **Square Miles** |
| Arthur | Nebraska | 469 | 715.36 |
| Keith | Nebraska | 8,018 | 1,061.60 |
| Perkins | Nebraska | 2,898 | 883.34 |
| Chase | Nebraska | 3,937 | 894.42 |
| Dundy | Nebraska | 1,831 | 919.68 |
| Hooker | Nebraska | 708 | 721.12 |
| McPherson | Nebraska | 493 | 858.98 |
| Lincoln | Nebraska | 35,550 | 2,564.07 |
| Thomas | Nebraska | 716 | 713.24 |
| Logan | Nebraska | 772 | 570.66 |
| Hayes | Nebraska | 897 | 713.06 |
| Frontier | Nebraska | 2,621 | 974.59 |
| Hitchcock | Nebraska | 2,825 | 709.94 |
| Red Willow | Nebraska | 10,722 | 716.99 |
| Boyd | Nebraska | 1,982 | 539.94 |
| Keya Paha | Nebraska | 791 | 773.07 |
| Holt | Nebraska | 10,250 | 2,412.40 |
| Rock | Nebraska | 1,390 | 1,008.32 |
| Brown | Nebraska | 2,960 | 1,221.33 |
| Loup | Nebraska | 591 | 568.29 |
| Garfield | Nebraska | 2,011 | 569.79 |
| Wheeler | Nebraska | 776 | 575.18 |
| Valley | Nebraska | 4,184 | 568.05 |
| Greeley | Nebraska | 2,399 | 569.81 |
| Sherman | Nebraska | 3,054 | 565.83 |
| Howard | Nebraska | 6,429 | 569.34 |
| Custer | Nebraska | 10,807 | 2,575.52 |
| Dawson | Nebraska | 23,640 | 1,013.10 |
| Buffalo | Nebraska | 49,383 | 968.11 |
| Gosper | Nebraska | 1,971 | 458.16 |
| Phelps | Nebraska | 9,266 | 539.79 |
| Kearney | Nebraska | 6,552 | 516.24 |
| Furnas | Nebraska | 4,787 | 719.13 |

6

| Harlan | Nebraska | 3,473 | 553.47 |
|---|---|---|---|
| Franklin | Nebraska | 3,014 | 575.82 |
| Blaine | Nebraska | 484 | 710.87 |
| Cheyenne | Kansas | 2,661 | 1,019.89 |
| Rawlins | Kansas | 2,549 | 1,069.42 |
| Sherman | Kansas | 5,965 | 1,056.07 |
| Thomas | Kansas | 7,892 | 1,074.69 |
| Wallace | Kansas | 1,497 | 913.65 |
| Logan | Kansas | 2,831 | 1,072.99 |
| Greeley | Kansas | 1,296 | 778.45 |
| Wichita | Kansas | 2,112 | 718.57 |
| **County** | **State** | **Population** | **Square Miles** |
| Hamilton | Kansas | 2,536 | 996.51 |
| Kearny | Kansas | 3,917 | 870.54 |
| Stanton | Kansas | 2,062 | 680.35 |
| Grant | Kansas | 7,646 | 574.80 |
| Morton | Kansas | 2,848 | 729.73 |
| Stevens | Kansas | 5,584 | 727.29 |
| Haskell | Kansas | 4,006 | 577.52 |
| Seward | Kansas | 22,709 | 639.50 |
| Meade | Kansas | 4,216 | 978.09 |
| Decatur | Kansas | 2,832 | 893.52 |
| Sheridan | Kansas | 2,509 | 895.96 |
| Gove | Kansas | 2,589 | 1,071.67 |
| Scott | Kansas | 5,032 | 717.54 |
| Lane | Kansas | 1,636 | 717.46 |
| Finney | Kansas | 36,722 | 1,301.97 |
| Gray | Kansas | 6,034 | 868.87 |
| Costilla | Colorado | 3,721 | 1,226.95 |
| Huerfano | Colorado | 6,677 | 1,591.00 |
| Custer | Colorado | 4,602 | 738.63 |
| Las Animas | Colorado | 14,103 | 4,772.67 |
| Otero | Colorado | 18,295 | 1,261.96 |
| Bent | Colorado | 5,861 | 1,512.86 |
| Prowers | Colorado | 11,922 | 1,638.40 |
| Crowley | Colorado | 5,694 | 787.42 |
| Kiowa | Colorado | 1,373 | 1,767.77 |
| Lincoln | Colorado | 5,643 | 2,577.63 |
| Cheyenne | Colorado | 1,848 | 1,778.28 |
| Kit Carson | Colorado | 8,195 | 2,160.82 |
| Elbert | Colorado | 25,231 | 1,850.85 |
| Washington | Colorado | 4,908 | 2,518.03 |
| Yuma | Colorado | 10,103 | 2,364.41 |

| Logan | Colorado | 21,919 | 1,838.55 |
|---|---|---|---|
| Sedgwick | Colorado | 2,407 | 548.04 |
| Phillips | Colorado | 4,288 | 687.93 |
| Laramie | Wyoming | 98,136 | 2,685.91 |
| Goshen | Wyoming | 13,390 | 2,225.39 |
| Platte | Wyoming | 8,680 | 2,084.21 |
| Albany | Wyoming | 38,256 | 4,273.84 |
| Converse | Wyoming | 14,191 | 4,254.88 |
| Niobrara | Wyoming | 2,480 | 2,626.04 |
| Campbell | Wyoming | 48,803 | 4,802.71 |
| Weston | Wyoming | 7,236 | 2,398.09 |
| Crook | Wyoming | 7,464 | 2,854.41 |
| **County** | **State** | **Population** | **Square Miles** |
| Custer | South Dakota | 8,596 | 1,557.00 |
| Fall River | South Dakota | 6,849 | 1,739.92 |
| Shannon | South Dakota | 14,415 | 2,093.90 |
| Bennett | South Dakota | 3,460 | 1,184.71 |
| Jackson | South Dakota | 3,326 | 1,863.91 |
| Mellette | South Dakota | 2,102 | 1,307.31 |
| Todd | South Dakota | 10,155 | 1,388.56 |
| Tripp | South Dakota | 5,492 | 1,612.45 |
| Brule | South Dakota | 5,238 | 817.24 |
| Gregory | South Dakota | 4,171 | 1,014.96 |
| Charles Mix | South Dakota | 9,396 | 1,097.49 |
| Douglas | South Dakota | 2,932 | 431.80 |
| Bon Homme | South Dakota | 6,984 | 563.70 |
| Hutchinson | South Dakota | 7,368 | 812.90 |
| Yankton | South Dakota | 22,616 | 521.16 |
| Clay | South Dakota | 14,086 | 412.19 |
| **TOTAL** | | 977,606 | 151,698.15 |