## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN BANKERS ASSOCIATION,

      *Plaintiff*,

   v.

NATIONAL CREDIT UNION
ADMINISTRATION,

      *Defendant.*

Civil Action No. 16-2394 (DLF)

## MEMORANDUM OPINION

The Federal Credit Union Act limits membership in certain credit unions to persons or organizations within a "well-defined local community, neighborhood, or rural district" and requires the National Credit Union Administration (NCUA) to define that phrase by regulation. 12 U.S.C. § 1759(b)(3), (g)(1). At issue is an NCUA rule (the Rule) that broadens the agency's definitions of *local community* and *rural district*. 81 Fed. Reg. 88,412, 88,440 (Dec. 7, 2016).

Before the Court are cross-motions for summary judgment filed by the American Bankers Association (ABA) and the NCUA. Dkt. 14; Dkt. 19. The ABA challenges four definitional decisions made by the NCUA in the Rule. The Court concludes that two of those definitional decisions violate the Administrative Procedure Act by exceeding the agency's statutory authority. Accordingly, the Court will grant in part and deny in part the ABA's motion for summary judgment, and will grant in part and deny in part the NCUA's cross-motion for summary judgment.

## I. BACKGROUND

Federal credit unions are mutually-owned financial institutions chartered and regulated by the NCUA. They offer many of the consumer products and services offered by other depository institutions, such as the banks represented by the ABA. U.S. Dep't of the Treasury, *Comparing Credit Unions with Other Institutions* 19 (Jan. 2001). Federal credit unions and banks differ, however, in a few ways. Federal credit unions enjoy the advantage of exemption from federal, state, and local taxes, with few exceptions. 12 U.S.C. § 1768. But they face limitations on their commercial lending and securities activities, the terms of their interest rates, and—central to this case—the areas and categories of persons that they can serve. *Id.* § 1759; *see* U.S. Dep't of the Treasury, *Comparing Credit Unions with Other Institutions* 19.

This case concerns community credit unions, which are federal credit unions limited to serving "persons or organizations within a well-defined local community, neighborhood, or rural district." 12 U.S.C. § 1759(b)(3). In undertaking the cartographic challenge of defining the *local community* term, the NCUA has relied on statistical measures established by the Office of Management and Budget (OMB). Several geographic measures are relevant to this suit:

- *Core-Based Statistical Area* is a category composed of the country's Metropolitan Statistical Areas and Micropolitan Statistical Areas.

  - *Metropolitan Statistical Areas* are defined by the OMB as having "at least one urbanized area of 50,000 or more population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties." Office of Mgmt. & Budget, Bulletin No. 15-01 (July 15, 2015) [hereinafter OMB Bulletin No. 15-01]. They are "delineated in terms of whole counties (or equivalent entities)." *Id.* A surrounding county may be part of a Metropolitan Statistical Area only if at least 25 percent of its workers commute into the central county, or if at least 25 percent of the central county's workers commute to the surrounding county. 75 Fed. Reg. 37,246, 37,250 (June 28, 2010). The OMB cautions that Metropolitan Statistical Area delineations "should not serve as a general-purpose framework for nonstatistical activities." OMB Bulletin No. 15-01.

  - *Micropolitan Statistical Areas* are identical to Metropolitan Statistical Areas except that their urbanized areas are smaller. In a Micropolitan Statistical Area,

the urbanized area (also known as the *core*), contains at least 10,000 but fewer than 50,000 people. *Id.*

- o A *Metropolitan Division* is a subdivision of a large Metropolitan Statistical Area. Specifically, a Metropolitan Division is "a county or group of counties within a Metropolitan Statistical Area that has a population core of at least 2.5 million." *Id.*

- *Combined Statistical Areas* are composed of adjacent Core-Based Statistical Areas that share what the OMB calls "substantial employment interchange." U.S. Census Bureau, *Geographic Terms and Concepts*, https://www.census.gov/geo/reference /gtc/gtc_cbsa.html. Two Core-Based Statistical Areas have the requisite interchange if their "employment interchange measure" is at least 15. The employment interchange measure is easiest understood with an example: if 8 percent of County A commutes to County B, and 7 percent of County B commutes to County A, the employment interchange is 15 (the sum of the decimals multiplied by 100). 75 Fed. Reg. at 37,248. The OMB characterizes Combined Statistical Areas as "representing larger regions that reflect broader social and economic interactions, such as wholesaling, commodity distribution, and weekend recreation activities, and are likely to be of considerable interest to regional authorities and the private sector." OMB Bulletin No. 15-01.

- A *Single Political Jurisdiction* is a city, county, or the political equivalent. 81 Fed. Reg. at 88,440. While the other terms originated with the OMB, this one appears to be the NCUA's own.

The Rule, promulgated in 2016, defines "local community, neighborhood, or rural district" in four ways challenged here. First, the Rule automatically characterizes as part of a local community any portion of any Core-Based Statistical Area (or of a Metropolitan Division instead when there is one) as long as the portion contains no more than 2.5 million people. 81 Fed. Reg. at 88,440. The NCUA interpreted its previous iteration of the regulation as categorizing a portion of a Core-Based Statistical Area as belonging to a local community only if the core was itself included, but the 2016 Rule does not include that requirement. *Id.* at 88,413– 14. Now, a credit union can serve areas within a Core-Based Statistical Area that do not include the core.

Second, the Rule automatically characterizes any individual portion of a Combined Statistical Area as belonging to a local community as long as the portion contains no more than

2.5 million people.  *Id.* at 88,440.  An example of a Combined Statistical Area is the Washington-Baltimore-Arlington, DC-MD-VA-WV-PA Combined Statistical Area, which includes eight Core-Based Statistical Areas from the District of Columbia, Virginia, Maryland, West Virginia, and Pennsylvania.

Third, the Rule allows a credit union serving a portion of a Single Political Jurisdiction, Core-Based Statistical Area, or Combined Statistical Area to add an adjacent area if the credit union can demonstrate that the adjacent area is part of the same local community based on various factors that indicate common interests or interaction.  *Id.*

Fourth, the Rule increases the population limit for *rural districts* to one million people. *Id.*  A proposed service area within the population limit automatically qualifies as a part of a *rural district* if either (1) most of the area's population resides in Census Bureau-designated rural units or (2) the area's population density does not exceed 100 persons per square mile.  *Id.*  An area covering the state of Wyoming and portions of six surrounding states, for example, is considered a rural district under the Rule.

The ABA challenges the Rule under the Administrative Procedure Act, arguing that the NCUA exceeded its statutory authority and that the Rule is arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A), (C).  Both parties moved for summary judgment, and the case was reassigned to the undersigned judge on December 4, 2017.

A.      **Statutory History**

The Federal Credit Union Act (the Act) has its roots in the Great Depression.  In the years following the stock market crash of 1929, many Americans lost access to credit at reasonable interest rates.  *First Nat'l Bank & Tr. Co. v. NCUA*, 988 F.2d 1272, 1274 (D.C. Cir. 1993). Because they lacked the security required for bank loans, "working Americans turned to loan

sharks who typically charged usurious interest rates, which was thought to reduce the overall purchasing power of American consumers." *Id.* (citing 78 Cong. Rec. 12,223 (1934)). Congress sought to solve this problem with the Act. *See* Pub. L. No. 73-467, 48 Stat. 1216 (1934) (codified at 12 U.S.C. § 1751 *et seq.*).

Signed in 1934, the Act was designed to establish a stable federal system of cooperative credit, strengthen the country's securities market, and "make more available to people of small means credit for provident purposes." *Id.* pmbl. To ensure that federal credit unions met their members' borrowing needs, the Act established the basic features of credit unions that persist today. The Act required credit unions to be owned and controlled by members and empowered credit unions to make loans only to members.[1] *Id.* §§ 103, 107, 109, 111. "Congress expected that such measures guaranteeing democratic self-government would infuse the credit union with a spirit of cooperative self-help and ensure that the credit union would remain responsive to its members' needs." *First Nat'l Bank*, 988 F.2d at 1274.

The Act also provided for two basic types of credit unions: common-bond credit unions (those whose membership shares an occupational or associational bond) and community credit unions (those whose membership shares geographic and communal ties). Pub. L. No. 73-467, § 109. The Act accordingly restricted the eligible fields of credit-union membership to "groups having a common bond of occupation, or association" or "groups within a well-defined neighborhood, community, or rural district." *Id.* This requirement was "the cement that united credit union members in a cooperative venture." *First Nat'l Bank & Tr. Co. v. NCUA*, 90 F.3d 525, 526, 529–30 (D.C. Cir. 1996), *aff'd*, 522 U.S. 479 (1998). "The Congress intended that

---

[1] A later amendment allowed credit unions to make loans to other credit unions as well. *See* 12 U.S.C. § 1757(5).

each [federal credit union] be a cohesive association in which the members are known by the officers and by each other in order to 'ensure both that those making lending decisions would know more about applicants and that borrowers would be more reluctant to default.'" *Id.* (quoting *First Nat'l Bank*, 988 F.2d at 1276).

The NCUA and its predecessors initially interpreted the Act to require that every member of a common-bond credit union—the type not at issue here—share the same occupational bond. *First Nat'l Bank*, 522 U.S. at 484.  But in 1982, the NCUA "reversed its longstanding policy in order to permit [common-bond] credit unions to be composed of *multiple* unrelated employer groups." *Id.* (emphasis added).  In 1998, however, the United States Supreme Court rejected the NCUA's new interpretation as "simply not what the statute provides" and "contrary to the unambiguously expressed intent of Congress." *First Nat'l Bank*, 522 U.S. at 501, 503.

Within months of the Supreme Court's decision, Congress amended the Act via the Credit Union Membership Access Act (the 1998 Act).  *See* Pub. L. No. 105-219, 112 Stat. 913 (1998).  In the preface to the 1998 Act, Congress reiterated its longstanding support for credit unions, finding that they "have the specified mission of meeting the credit and savings needs of consumers, especially persons of modest means." *Id.* § 2.  Congress also found that "a meaningful affinity and bond among members, manifested by a commonality of routine interaction, shared and related work experiences, interests, or activities, or the maintenance of an otherwise well-understood sense of cohesion or identity is essential to the fulfillment of the public mission of credit unions." *Id.*  Most relevant here, the 1998 Act modified the categories of service areas for community credit unions:  whereas service areas were previously limited to a "well-defined neighborhood, community, or rural district," Pub. L. No. 73-467, § 109, the 1998 Act changed that phrase to "well-defined *local* community, neighborhood, or rural district," Pub.

L. No. 105-219, § 101 (codified at 12 U.S.C. § 1759(b)(3)) (emphasis added).  The 1998 Act

required the NCUA to prescribe a definition of the phrase by regulation.  *Id.* § 103 (codified at

12 U.S.C. § 1759(g)(1)).

### B.     The NCUA's Interpretations

Under this express delegation of definitional authority, the NCUA has promulgated

multiple rules addressing the permissible service areas for community credit unions.

#### 1.   *The 1998 Rule*

Four months after the passage of the 1998 Act, the NCUA promulgated a rule defining

the geographic scope of community credit unions.  63 Fed. Reg. 71,998 (Dec. 30, 1998).  The

NCUA stated that its "policy is to limit the community to a single, geographically well-defined

area where individuals have common interests or interact."  *Id.* at 72,037.  The rule thus

"recognize[d] four types of affinity on which a community charter can be based—persons who

live in, worship in, attend school in, or work in the community."  *Id.*  Notably, the NCUA

responded to Congress's decision to replace the term *community* with *local community*:

> [T]he [NCUA] Board concluded that the addition of the word "local" to the
> previous statutory language was intended as a limiting factor and that additional
> clarification was required relative to what would qualify as a community charter.
> The Board further concluded that a more circumspect and restricted approach to
> chartering community credit unions appeared to be the congressional intent.

*Id.* at 72,012.

The rule established three requirements for community credit union applications:  (1) the

proposed area must have clearly defined geographic boundaries; (2) the applicant must

demonstrate that the proposed area falls within a well-defined local community, neighborhood,

or rural district; and (3) the residents of the area must have common interests or interact.  *Id.* at

72,037.  The rule identified factors that the agency would consider in assessing the third

requirement (which informed the second, *id.* at 72,012), including (i) the presence or absence of a single major trade area, shared governmental or civil facilities, or area newspaper; and (ii) the population and geographic size of the proposed area. *Id.* at 72,037. The NCUA noted that states and congressional districts did not meet the requirement that a service area be a local community, neighborhood, or rural district. *Id.*

The rule also illustrated its requirements with examples of acceptable, unacceptable, and insufficiently defined fields of membership for community credit unions. Acceptable fields included people who live or work in the same county, the same school district, or the same university. *Id.* at 72,038. Unacceptable fields included "persons who live or work in the Greater Boston Metropolitan Area" or "the State of California." *Id.* at 72,039. And insufficiently defined fields included "persons who live or work within and businesses located within a ten-mile radius of Washington, DC" or "persons who live or work in the industrial section of New York." *Id.*

## 2. *The 2003 Rule*

In 2003, the NCUA promulgated a rule that broadened the *local community* requirement. 68 Fed. Reg. 18,334 (Apr. 15, 2003). First, the rule established that any Single Political Jurisdiction (or any contiguous portion of one) automatically qualified as a local community. *Id.* at 18,357. The NCUA clarified that this was an "irrebuttable presumption, regardless of population size," and that "no documentation demonstrating that the political jurisdiction is a community would be required." *Id.* at 18,337. Second, the rule provided that the statutory requirements might be met if "the area to be served is in multiple contiguous political jurisdictions" as long as the area's population does not exceed 500,000. *Id.* at 18,357. And third, the rule provided that the requirements might be met by an area with a population of up to

one million people if the area is a Metropolitan Statistical Area or an equivalent area.  *Id.*  For any area not within a Single Political Jurisdiction, the rule required credit union applicants to submit a narrative letter describing how the proposed area meets the standards for community interaction or common interests.  *Id.* at 18,337, 18,357.

### 3. The 2010 Rule

The NCUA further expanded the permissible service areas in a 2010 rule.  While the NCUA acknowledged that "the statutory language 'local community' does imply some limit" and reiterated that states and congressional districts do not qualify as local communities or rural districts, the agency abandoned its narrative-based approach.  75 Fed. Reg. 36,257, 36,258, 36,264 (June 25, 2010).  The NCUA stated that the local community requirement is met if the proposed service area is (1) a Single Political Jurisdiction or any contiguous portion thereof; or (2) a Core-Based Statistical Area or Metropolitan Division with a population not exceeding 2.5 million people, or portion thereof.  *Id.* at 36,264; *see also id.* at 36,257.  In the rule's preamble, the NCUA noted that "any portion of a [Core-Based Statistical Area] chosen as the geographic area of the community must . . . contain the core."  *Id.* at 36,260.

The 2010 rule also defined *rural district* as an area with (1) well-defined, contiguous geographic boundaries; (2) either a population that mostly lives in areas designated as rural or a population density of no more than 100 persons per square mile; and (3) a population of no more than 200,000.  *Id.* at 36,264.

### 4. The 2013 Rule

In 2013, the NCUA increased the population limit for rural districts to the greater of 250,000 people or 3 percent of the state in which most of the district is located.  78 Fed. Reg. 13,460, 13,463 (Feb. 28, 2013).

### C.    The 2016 Rule

In a final rule promulgated in December 2016, the NCUA adopted the four changes that the ABA now challenges.  First, the Rule modifies the requirements for Core-Based Statistical Areas.  The Rule now automatically qualifies as part of a local community any contiguous portion of a Core-Based Statistical Area (or of a Metropolitan Division when there is one) of more than 2.5 million people as long as the portion's population does not exceed 2.5 million people.  81 Fed. Reg. at 88,440.  In the Rule's preamble, the NCUA observed that it was eliminating the requirement that a portion of a Core-Based Statistical Area belongs to a local community only if it includes the core.  *Id.* at 88,413–14.  The NCUA reasoned that credit unions were fulfilling the underlying purpose of the core requirement—to ensure adequate service to low-income communities—without regard to location.  *Id.*  Bank-affiliated commenters expressed concern that eliminating the core requirement would allow credit unions to redline out low-income communities; the NCUA responded by asserting that its supervisory process would prevent discrimination.  *Id.*

Second, the Rule adds Combined Statistical Areas to the list of categories that automatically qualify as belonging to a local community, subject to a 2.5 million population limit.  *Id.* at 88,440.  In response to commenters who argued that a Combined Statistical Area is too expansive to be considered a local community, the NCUA emphasized the population limit and observed that the average Combined Statistical Area was smaller than the average Core-Based Statistical Area that the NCUA had approved since 2010.  *Id.* at 88,414–15.

Third, the Rule allows credit unions to apply to add areas adjacent to a portion of a Single Political Jurisdiction, Core-Based Statistical Area, or Combined Statistical Area that they already serve, subject to the same population limit.  *Id.* at 88,440.  To expand a service area, applicants

must establish that the adjacent area is part of the same local community as the already-served statistical area with "objective documentation" showing common interests or interaction among residents on both sides of the statistical area's perimeter.  *Id.* at 88,415.

Fourth, the Rule increases the population limit for rural districts to one million people and eliminates the alternative population limit of 3 percent of the state in which most of the district is located.  *Id.* at 88,440.  The NCUA defended the increased population limit on the ground that it would allow greater and more efficient service to rural areas.  *Id.* at 88,417.  As before, an area qualifies as a rural district only if it meets the population limit and either (1) more than 50 percent of the area's population resides in rural areas (as defined by government agencies) or (2) the area's population density does not exceed 100 persons per square mile.  *Id.* at 88,440.  The Rule also introduces a requirement that a rural district cannot exceed the boundaries of the states bordering the state in which the credit union is headquartered.  *Id.*

## II.  LEGAL STANDARDS

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one with potential to change the substantive outcome of the litigation.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

Here the plaintiff seeks review of an agency's final rule, invoking the Administrative Procedure Act's requirement that a court "hold unlawful and set aside" any aspect of the rule that is "arbitrary [and] capricious" or "in excess of statutory . . . authority."  5 U.S.C.

§ 706(2)(A), (C).  In an Administrative Procedure Act case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).  In other words, "the entire case . . . is a question of law" and the district court "sits as an appellate tribunal."  *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotation marks and footnote omitted).

Review of an agency's interpretation of a statute it administers is governed by the two-step *Chevron* doctrine.  At Step One, a court must determine "whether Congress has directly spoken to the precise question at issue" or instead has delegated to an agency the legislative authority to "elucidate a specific provision of the statute by regulation."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843–44 (1984).  If the latter, a court must reach Step Two, which asks whether the agency action "is based on a permissible construction of the statute" or instead is "manifestly contrary to the statute."  *Id.* at 843, 844.

A statute's grant of definitional authority to an agency decides Step One in the agency's favor because the definitional provision "confirms that the Congress has not directly spoken" to the interpretive question.  *Lindeen v. SEC*, 825 F.3d 646, 653 (D.C. Cir. 2016) (internal quotation marks and emphasis omitted); *see also Women Involved in Farm Econ. v. U.S. Dep't of Agric.*, 876 F.2d 994, 1000–01 (D.C. Cir. 1989) (concluding that when a statute gives an agency definitional authority, "there is no need to rely on the presumptive delegation to agencies of authority to define ambiguous or imprecise terms we apply under the *Chevron* doctrine, for the delegation of interpretative authority is express" (citation omitted)).  The grant of definitional authority also "necessarily suggests that Congress did not intend the [terms] to be applied in [their] plain meaning sense," *Women Involved*, 876 F.2d at 1000 (emphasis omitted), and

"manifests that the Congress intended the [agency] to enjoy broad discretion to decide" what the statute means by the terms to be defined, *Lindeen*, 825 F.3d at 653.

But that broad discretion is not unlimited. Even a statute that gives an agency definitional authority does not leave the agency "free to write its own law." *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 968 (D.C. Cir. 1985) (quotation marks omitted). Instead, the statute carries the implicit premise that the agency's definitions must be reasonable. *See Lindeen*, 825 F.3d at 656 (sustaining an agency's exercise of express definitional authority because the agency "acted reasonably" in making its definitional decision); *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 717 (D.C. Cir. 2016) (sustaining an agency's exercise of express definitional authority because the agency's interpretation of the statute was "reasoned and reasonable"); *Women Involved*, 876 F.2d at 1003 (suggesting that when an agency acts under express definitional authority, the ultimate question is whether the agency's definition is "a reasonable interpretation of the statute"). In other words, the agency's exercise of definitional authority must survive *Chevron* Step Two—it cannot be "manifestly contrary to the statute." *Lindeen*, 825 F.3d at 656 (quotation marks omitted); *see also* NCUA Suppl. Mem. at 1, Dkt. 31 (acknowledging the same).

Arbitrary and capricious review is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quotation marks and alteration omitted). A court "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Even so, the standard is not entirely toothless: the agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Id.* When reviewing the agency's explanation, a court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of

judgment." *Id.* (quotation marks omitted). A court defers to the agency "as long as the action is supported by 'reasoned decisionmaking.'" *Bean v. Perdue*, No. 17-cv-0140, 2017 WL 4005603, at *5 (D.D.C. Sept. 11, 2017) (quoting *Fox*, 684 F.3d at 75). Finally, the party challenging an agency's action as arbitrary and capricious bears the burden of proof. *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

## III. ANALYSIS

The ABA has Article III and prudential standing to bring this suit because its members compete with the credit unions that benefit from the NCUA's broadened definitions. *See First Nat'l Bank*, 522 U.S. at 488. The ABA challenges the Rule under the Administrative Procedure Act, which requires a court to "hold unlawful and set aside" agency action "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). The Court concludes that the Rule's approaches to Combined Statistical Areas and rural districts are manifestly contrary to the Act and thus violate Section 706(2)(C). On the other hand, the Rule's approaches to Core-Based Statistical Areas and adjacent areas are neither in excess of the agency's statutory authority nor arbitrary and capricious, though the approach to Core-Based Statistical Areas pushes against the outer limits of reasonableness.

The interpretive question presented is whether the terms *local community* and *rural district* can reasonably be thought to encompass the scope that the NCUA has given them. Discerning the boundaries of vague terms—permissible boundaries, in this case—is notoriously challenging, but that is the task at hand. Several principles guide the inquiry.

First, it is the meaning of a statutory term at the time it became law that controls. *See, e.g.*, *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876 (2014) (stating that a statute is interpreted according to its contemporaneous meaning); *Carcieri v. Salazar*, 555 U.S. 379, 388 (2009) (examining the ordinary meaning of the relevant term "as understood when the [statute] was enacted"). To discern contemporaneous meaning, courts look first to contemporaneous dictionaries. *See PHH Corp. v. CFPB*, 881 F.3d 75, 130 (D.C. Cir. 2018) (Griffith, J., concurring in the judgment) (collecting cases for the observation that the Supreme Court "generally begins [an interpretive task] with dictionaries"); *Kellogg Brown & Root Servs. v. U.S., ex rel. Carter*, 135 S. Ct. 1970, 1976 (2015) (citing dictionaries from the period surrounding the date of enactment).

But exclusive reliance on dictionaries would be misguided. For one, a dictionary "cannot delineate the periphery" of vague terms (those that blur around the edges) like *local community* and *rural district*. Antonin Scalia & Bryan A. Garner, *Reading Law* 418 (2012); *see also* William N. Eskridge Jr., *Interpreting Law* 58 (2016) (same). More significantly, contemporaneous dictionaries do not provide American definitions of *local community* or *rural district*. The terms' individual words are defined, of course, and definitions of component words often shed light on a term's meaning, but a term does not necessarily mean the sum of its parts. *See FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011) ("[T]wo words together may assume a more particular meaning than those words in isolation."); *United States v. Castleman*, 134 S. Ct. 1405, 1411 (2014) (observing that the term *domestic violence* encompasses "acts that one might not characterize as 'violent' in a nondomestic context"). For these reasons, it is important to consult the interpretive canons and common usage of the terms *local community* and *rural district* at the time of their enactment.

**A.      The NCUA's Definition of *Local Community***

The ABA challenges three aspects of the Rule that expand the NCUA's definition of *local community*:  the addition of Combined Statistical Areas to the list of automatic qualifiers, the absence of a core requirement for Core-Based Statistical Areas, and the potential inclusion in a service map of areas adjacent to statistical areas that are categorically defined as local communities.

**1.      Meaning of *Local Community***

The question whether the NCUA's definitions of *local community* are manifestly contrary to the statute requires comparisons to the term's 1998 meaning.  The term *community* was included in the 1934 Act, but because that term was replaced in 1998 by the distinct term *local community*, the latter year is most relevant.

**a.  Definitions**

In 1998, the word *community*, on its own, could refer to a group as small as a few people (*e.g.*, a church *community* group) or one including most of the world (the international *community*).  That said, several dictionaries define *community* as a body of people who live "in the same locality" or in "one place."  Chambers Dictionary (1993); Oxford Dictionary of Current English (3d ed. 2001).  And one of Black's definitions for *community* is a "neighborhood, vicinity, or locality."  Black's Law Dictionary (7th ed. 1999).  Geographic proximity aside, the defining characteristic of a community was a common bond.  *See, e.g.*, Chambers Dictionary (1993) (defining *community* as "a group of people who have common interests, characteristics or culture").

Many 1998-era dictionaries make clear that *local* meant geographically limited.  *See, e.g.*, Merriam Webster's Collegiate Dictionary (10th ed. 1997) (defining *local* as "of, relating to, or

characteristic of a particular place: not general or widespread"). Webster's Third provides more precise definitions: "primarily serving the needs of a particular limited district, often a community or minor political subdivision" and "limited in operation to only part of the territory subject to the legislative power (as a town, district, county)." Webster's Third New International Dictionary (3d ed. 1993); *see also id.* (defining *local* as "a newspaper story or item of interest mainly to readers who live in the town or city where the paper is published"). These definitions—which cite towns, counties, and other "minor" political subdivisions as examples of local areas—suggest that a *local* community generally extended no farther than countywide.

While 1998-era dictionaries do not define the term *local community*, several state statutory provisions in effect around that time did. One state defined the term broadly, but numerous others defined it narrowly. Kentucky defined *local community crisis response team* as "a team formed to provide crisis response services in a county, district, or region." Ky. Rev. Stat. Ann. § 36.250(5) (2017) (relevant language effective 1998). Against that broad definition, however, Rhode Island defined *local communities* as "any cities and towns of Rhode Island." R.I. Gen. Laws § 23-7.1-3 (2017) (relevant language effective 1968). Mississippi defined *local community* in an early-intervention statute as "a county either jointly, severally, or a portion thereof, participating in the provision of early intervention services." Miss. Code. § 41-87-5(f) (2017) (relevant language effective 1990). In a statute concerning the conversion of single-unit home communities to multi-unit condominiums or cooperatives, Delaware defined *affected local community* as "the municipality or county in which the largest portion of the real property which has been proposed as a conversion project is situated." Del. Code Ann. tit. 25, § 7102(1) (2018) (relevant language enacted 1983). Alaska defined *local community entity* as "a city or borough or other political subdivision of the state, a nonprofit organization, or a combination of these."

Alaska Stat. § 18.66.990(7) (2017) (relevant language effective 1996).  Iowa defined *local community* as "a county conservation board, a city, or a nongovernmental organization operating on a nonprofit basis."  Iowa Code Ann. § 461.36 (West) (2018) (relevant language enacted 2010).  Oklahoma defined the term to mean a "town or city and [] county . . . ; provided, a city or town and a county may jointly constitute the 'local community.'"  Okla. Stat. Ann. tit. 68, § 4203 (West) (2018) (relevant language enacted 2006).  In a statute addressing violent video games, Michigan defined *local community* as "the county in which the video game was disseminated."  Mich. Comp. Laws Ann. § 722.686 (West) (2018) (relevant language effective 2005).  Also relevant is a California definitional provision:  "'Community,' 'locality,' 'local government,' or 'jurisdiction' means a city, city and county, or county."  Cal. Gov't Code § 65582(a) (West 2018) (relevant language enacted 1980).  On the whole, these definitions suggest that *local community* was understood in 1998 as generally encompassing an area no larger than a county.

### b.  Textual Context and Statutory History

A circumscribed understanding of *local community* also follows from the term's surrounding text and statutory history.  First, the term is embedded in a statutory provision that contains other geographically limited terms:  "local community, *neighborhood*, or *rural district*." 12 U.S.C. § 1759(b)(3) (emphases added).  These terms inform the interpretation of *local community* because, as the *noscitur a sociis* canon dictates, "a word is given more precise content by the neighboring words with which it is associated."  *United States v. Williams*, 553 U.S. 285, 294 (2008).  By applying the *noscitur* canon, courts "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress."  *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015).

Both early- and late-twentieth century dictionaries define *neighborhood* as a relatively small area: the term referred to a "section or district" lived in by people "forming a loosely cohesive community within a larger unit (as a city, town) . . . ." Webster's Third New International Dictionary (3d ed. 1993); *see also* 6 The Century Dictionary and Cyclopedia (1911) (defining *neighborhood* as "[t]hose living in the vicinity or adjoining locality; neighbors collectively"). Similarly, *rural district* generally referred to areas no larger than a county. *See infra* Section III.B. The geographic scope of the "company [the term *local community*] keeps," *Yates*, 135 U.S. at 1085, suggests that the term describes areas similar in size to a neighborhood or county.

The Act's statutory history also "sheds . . . light on the text." *United States v. Quality Stores, Inc.*, 134 S. Ct. 1395, 1401 (2014); *see also Kellogg Brown*, 135 S. Ct. at 1977–78 (suggesting that in some cases the statutory history is "the strongest support" for a court's interpretation). The 1998 Congress did not spin the phrase *local community* from whole cloth— the word *community* had been in the Act since its enactment in 1934. *See* Pub. L. No. 73-467, § 109 (limiting membership to "groups within a well-defined neighborhood, community, or rural district."). As the NCUA has long conceded, the change from *community* to *local community* shrunk the phrase's geographic scope. *See* 63 Fed. Reg. at 72,012; Hr'g Tr. at 44, Dkt. 33. That means the preexisting understanding of *community* is relevant as an outer bound for the meaning of *local community*.

In 1934, *community* meant "a body of people having common organization or interests, or living in the same place under the same laws and regulations." Webster's New International Dictionary (2d ed. 1934); *see also* 2 The Century Dictionary and Cyclopedia (1911) (defining *community* as a "number of people associated together by the fact of residence in the same locality, . . . ; a village, township, or municipality"); *see also Lukens Steel Co. v. Perkins*, 107 F.2d 627, 631 (D.C. Cir. 1939), *rev'd on other grounds*, 310 U.S. 113 (1940) (observing that *community* connotes not "large geographical areas, with widely diverse interests" but rather "congeries of common interests arising from associations—social, business, religious, governmental, scholastic, recreational—involving considerations of public health, fire protection, water, sewage, transportation, and other services"). This informs the 1998 meaning of *local community* and provides further support for a narrow reading of the term.

2.     Combined Statistical Areas

The Rule automatically qualifies any contiguous portion of a Combined Statistical Area as part of a single local community, as long as the portion's population does not exceed 2.5 million.[2] A Combined Statistical Area consists of adjacent Core-Based Statistical Areas that, according to the OMB, have substantial employment interchange. 75 Fed. Reg. at 37,248.

---

[2] The ABA claims that the Rule also allows noncontiguous areas to qualify, but in its briefing the NCUA assures that the Rule requires contiguous areas. *See* ABA Br. at 25, Dkt. 14; NCUA Br. at 27–28, Dkt. 19-1. An agency's interpretation of its regulation advanced in a legal brief is entitled to deference unless it is "plainly erroneous or inconsistent with the regulation" or "does not reflect the agency's fair and considered judgment on the matter." *Auer v. Robbins*, 519 U.S. 452, 461–62 (1997). The Rule qualifies as part of a *local community* "a portion" of the relevant areas, 81 Fed. Reg. at 88,440, and that can reasonably be interpreted as requiring contiguity, so the NCUA's reading merits deference.

The Combined Statistical Area that includes Washington D.C., for example, is composed of the entirety of the colored area in this map:



The varying shades of green represent each of the eight Core-Based Statistical Areas that form the Combined Statistical Area. The OMB claims that Combined Statistical Areas "reflect broader social and economic interactions" like "wholesaling, commodity distribution, and weekend recreation activities." OMB Bulletin No. 15-01. The record, however, does not provide support for that conclusion. While Chambersburg-Waynesboro, for example, must have an employment interchange of at least 15 with Hagerstown-Martinsburg (its adjacent Core-Based Statistical Area), Chambersburg-Waynesboro does not necessarily have any interchange at all with any of the other Core-Based Statistical Areas. In other words, a Combined Statistical Area

might be composed of a series of daisy-chained Core-Based Statistical Areas that are linked to their neighbors but have nothing to do with those at the other end of the chain.

The NCUA argues that the population cap of 2.5 million people and the contiguity requirement together prevent distant and unconnected areas from being considered a local community. Those limits, however, do not solve the problem. Here's an extreme example:



According to the Rule, everyone living within the red rectangle, which is contiguous and contains fewer than 2.5 million people, is part of the same local community. *See* Hr'g Tr. at 42 (NCUA acknowledging that the Rule defines thin strips like the above as part of a single *local community*). That is true even though residents of Doylesburg, Pennsylvania (at the northern edge of the red rectangle) and residents of Partlow, Virginia (at the southern edge of the red rectangle) live about 200 miles from each other—around a 3.5-hour drive. What is more, unlike

some residents from even the perimeter of the D.C. Core-Based Statistical Area, residents of Doylesburg and Partlow do not necessarily share any commuting relationship to D.C. They might not share any commonality whatsoever beyond that they live in the Mid-Atlantic region of the United States within a certain radius of D.C.

The Doylesburg-Partlow example is extreme, but it is not hypothetical: the Rule *defines* the red rectangle as belonging to a single local community. If a credit union seeks to serve such an area, the NCUA has no discretion to reject the credit union's application on the ground that the area is not a local community. 81 Fed. Reg. at 88,440; *see also* Hr'g Tr. at 42. Because any portion of a Combined Statistical Area automatically qualifies, the NCUA can do nothing to prevent a gerrymandering credit union from serving up to 2.5 million people from all ends of a Combined Statistical Area.

A definition that calls Doylesburg, Pennsylvania and Partlow, Virginia residents part of the same local community is not anywhere near the term's standard meaning. As noted, at the time of enactment, numerous states defined the term as constituting a geographic scope no larger than a county. And definitions of the individual words *local* and *community* also suggest that a *local community* was understood as a group sharing a common bond and living in a geographically small area such as a county or municipality. Combined Statistical Areas do not necessarily have either of those characteristics: they sometimes stretch across vast regions that include multiple separate urban centers with suburban and rural communities, and residents of peripheral towns may have no common bond at all beyond regional proximity. Any number of less extreme examples make the same point: the Rule—which requires the NCUA to accept a service area based on a Combined Statistical Area as part of a *local community* no matter how

geographically dispersed and unconnected its 2.5 million or fewer members may be—is unreasonable.

The NCUA's responses are unpersuasive. First, the NCUA asserts that the term *local community* does not "connote any fixed restrictions" at all because the statute does not explicitly address the question how broad is too broad. NCUA Br. at 26, Dkt. 19-1. But while *local community* is vague, it is not devoid of meaning. Acceptance of the NCUA's argument would allow an agency to rewrite a statute whenever it is given the authority to define a vague term. Second, to suggest that it retains some discretion over areas like the red rectangle, the NCUA invokes a requirement that a credit union applicant must establish that it has the ability to serve its proposed service area. Hr'g Tr. at 36; *see also* 81 Fed. Reg. at 88,414. But that requirement is an additional one imposed on top of the *local community* requirement; it does not factor into the NCUA's definition of *local community*. *See* 75 Fed. Reg. at 36,261 ("[A]fter establishing the existence of a [well-defined local community]," a credit union must "demonstrate it is able to serve the [well-defined local community]."). Because the Rule automatically qualifies any area of 2.5 million or fewer people from any Combined Statistical Area as part of a local community—despite its potential geographic breadth and lack of commonality—this definition is manifestly contrary to the statute.

### 3. Core-Based Statistical Areas

Next, the Rule deems any individual portion of any Core-Based Statistical Area (or Metropolitan Division instead when there is one) a local community as long as the portion's population does not exceed 2.5 million. 81 Fed. Reg. at 88,440. A Core-Based Statistical Area consists of an urban core, its county, and any surrounding counties that are, according to OMB, highly socially and economically integrated with the core. 75 Fed. Reg. at 37,249; *see also* U.S.

Census Bureau, *Geographic Terms and Concepts*. The OMB defines social and economic integration with commuting ties: a surrounding county may be part of a Core-Based Statistical Area only if at least 25 percent of its workers commute into the central county or vice versa. 75 Fed. Reg. at 37,250.

The Rule eliminates two requirements that prevented certain areas within Core-Based Statistical Areas from being considered part of a single local community. First, while the NCUA interpreted the 2010 rule to define a portion of a Core-Based Statistical Area as part of a local community only if it included the core, the new Rule contains no such requirement, and the NCUA notes in the Rule's preamble that the core requirement is eliminated. 81 Fed. Reg. at 88,414, 88,440. Second, the Rule also eliminates the requirement from the 2010 rule that a Core-Based Statistical Area can form the basis for a local community only if the Core-Based Statistical Area as a whole contains no more than 2.5 million people. *Id.* Now, the *portion* of the Core-Based Statistical Area can contain no more than 2.5 million people, but the Core-Based Statistical Area itself can be any size. According to the NCUA, the 2010 rule inadvertently misstated the appropriate population limit and thus the population-limit increase in the Rule is merely a "technical remedy" to correct that mistake. *Id.* at 88,414; Hr'g Tr. at 39.

The Court's review of the Rule's definitional decisions regarding Core-Based Statistical Areas is limited to the absence of a core requirement. The complaint referred to the population-limit increase, Compl. ¶ 53, but to the extent that the ABA challenges the Rule on that basis, the claim is waived because the issue was not raised during the notice-and-comment rulemaking process. *See Koretoff v. Vilsack*, 707 F.3d 394, 397 (D.C. Cir. 2013) ("A party will normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration." (quotation marks omitted)); 81 Fed. Reg. at 88,414

(noting that no commenter opposed the population-limit increase). It is worth noting, however, that because of the population-limit increase, the Rule now automatically qualifies portions of ten of the largest Core-Based Statistical Areas (those with more than 2.5 million people and with no Metropolitan Division) as belonging to a single *local community*. And in conjunction with the elimination of the core requirement, the population-limit increase qualifies even portions drawn exclusively from the perimeter of those large Core-Based Statistical Areas.

On the absence of a core requirement, the ABA argues that the core is what united the Core-Based Statistical Area to begin with, so a Core-Based Statistical Area without a core cannot belong to a *local community*. *See* ABA Br. at 33–34, Dkt. 14-1. This argument is unconvincing. The Act contains nothing to suggest that a service area encompassing only part of a local community is off limits. Removing the core, moreover, actually *decreases* the geographic size of a service area based on a Core-Based Statistical Area—after all, the area of a circle becomes smaller when a donut hole is carved out. And the absence of the core does not alter the other residents' common bond. If residents of Arlington, Virginia and Bethesda, Maryland are part of the same local community, that is so because of commonalities based on their shared vicinity to Washington, D.C. These commonalities are unaffected by the absence of the D.C. core from a credit union's service map. In other words, Arlington and Bethesda residents share the common bond of residing in suburban D.C. regardless of whether D.C. residents are part of their credit union's service area.

The absence of the core requirement is nonetheless troubling, however, because it allows for geographically larger *local communities*. If the core requirement were in place, a credit union seeking to serve the Chicago Core-Based Statistical Area, for example, would not be able to reach past the core itself because the core's population is above the 2.5 million-person limit.

But without the core requirement and with the removal of the population limitation for Core-Based Statistical Areas or their Metropolitan Divisions, a credit union can now reach the outer boundaries of the largest Core-Based Statistical Areas or their Metropolitan Divisions, as long as the credit union serves no more than 2.5 million people. For example, the Rule describes residents of Reliance, Virginia (at the western edge of the red area) and residents of Lusby, Maryland (at the southeastern edge of the red area) as part of a single local community even though they live about 140 miles from each other—a drive of more than two hours:



Similarly, the Rule defines Shelby, Texas and Anahuac, Texas as part of a single local community although parts of those towns are 160 miles and more than 2.5 hours from each other; both towns are within the Houston Core-Based Statistical Area and are connected by a contiguous area with a population below 2.5 million. As with Combined Statistical Areas, any

such portion of a Core-Based Statistical Area or one of its Metropolitan Divisions automatically qualifies as part of a single local community under the Rule. As a result, the NCUA cannot prevent a gerrymandering credit union from serving the far-flung perimeter of the largest Core-Based Statistical Areas or their Metropolitan Divisions.

Such a capacious definition of *local community* is jarring, to say the least. Although 25 percent of the workers in each constituent county commute to the core, the corollary is that up to 75 percent of each county's workers do *not* make that commute and may have no ties to the core (much less to a remote town on the opposite side of the core) beyond regional proximity. Also, unlike distant commuters, people who live in the same city or county—the areas normally associated with the term *local community*—often share other communal ties. They are likely to vote in the same mayoral race, frequent the same parks, suffer the same potholes, or enroll their children in a common school district or sports league. Finally, even if it is granted that residents of Reliance and Lusby share community because a quarter of both of their counties work in the same core, they do not necessarily share a *local* community. It is possible, that is, to leave one's local community to commute to work.

Nonetheless, the towns in these examples can reasonably be thought to contain at least some traces of the social, economic, and geographic commonalities of a local community. At least 25 percent of the workers in Reliance's and Lusby's counties share the commonality of commuting to the D.C. core. 75 Fed. Reg. at 37,250. As even the ABA acknowledges, that is "pretty substantial commuting activity." Hr'g Tr. at 7. The commuting metric ensures that a service area's constituent counties are all within a feasible commuting radius of the core, which means that the service area shares at least some geographic ties and cannot expand without limit. Also, the OMB uses shared commuting activity as a proxy for extensive social and economic

commonalities, an inference that the NCUA has adopted. *See* 75 Fed. Reg. at 37,249; 81 Fed. Reg. at 88,450; NCUA Reply Br. at 16–17, Dkt. 25.

While these inferred social, economic, and geographic ties may be less robust than those of a prototypical local community, they provide at least some reasonable basis for the NCUA to define *local community* as including areas on the perimeter of a Core-Based Statistical Area. And a barely reasonable interpretation is enough to satisfy *Chevron* Step Two. The Act gives the NCUA "broad discretion" to define *local community*, *Lindeen*, 825 F.3d at 653, and that discretion includes the ability to make definitional decisions that do not derive from the term's "most natural reading," *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991). Given the reasonable basis put forth by the NCUA and the deference owed to the NCUA's definition, the absence of a core requirement is not manifestly contrary to the statute.

Neither is the elimination of the core requirement arbitrary and capricious. Apart from the requirement that the NCUA cannot imbue *local community* with an unreasonable meaning, the Act provides the NCUA with little guidance regarding what factors to consider in defining the term. Acting under its broad delegation of definitional authority, the NCUA adequately articulated reasons for eliminating the core requirement.

First, the NCUA explained that the Act does not mandate a core requirement, and that the majority of commenters favored repeal of the requirement because it "unnecessarily impose[d] an additional constraint on who credit unions can serve." 81 Fed. Reg. at 88,413. Second, the NCUA determined that the core requirement had led to negative consequences. It had limited the flexibility needed by a credit union to establish a "marketplace footprint;" it had deterred credit unions from serving Core-Based Statistical Areas with populated urban areas; and it had required credit unions to sacrifice service to non-core portions of Core-Based Statistical Areas.

*Id.* By removing the core requirement, the NCUA reasonably sought to alleviate these adverse results.

Finally, the NCUA responded to concerns that repeal "would effectively permit 'redlining' through formation of a community primarily consisting of wealthier areas within a [Core-Based Statistical Area], while excluding areas where low-income and minority populations are concentrated." *Id.* The NCUA explained that it "has in place a supervisory process to assess [a credit union's] efforts to offer service to the entire community [the credit union] seeks to serve." *Id.* The NCUA represented that it would "hold[] credit union management accountable for the results of an annual evaluation [occurring during the first three years of a credit union's charter or expansion and overseen by the Office of Consumer Protection] that encompasses a community [credit union's] implementation of its business and marketing plans." *Id.* The NCUA also cited its "mandate to consider member complaints alleging discriminatory practices affecting low-income and underserved populations, such as redlining, and to respond as necessary when such practices are shown to exist." *Id.* at 88,414. Based on this supervisory process, especially the evaluations by the Office of Consumer Protection, the NCUA decided to repeal the core requirement "in view of credit unions' success in providing financial services to low-income and underserved populations without regard to where they are located within a community, *i.e.*, beyond its 'core area.'" *Id.*

Notwithstanding this explanation, the ABA maintains that the NCUA's reasons were inadequate because they "amount to allowing credit unions to exclude less affluent and minority customers they do not wish to serve—against Congress's intent." ABA Reply Br. at 25, Dkt. 23. As evidence of that intent, the ABA emphasizes that in the 1998 Act, Congress found that the credit unions' mission of meeting consumer savings and credit needs extends "especially [to]

persons of modest means." Pub. L. No. 105-219, § 2; *see also* Pub. L. No. 73-467, pmbl. (stating that a purpose of the statute was to "make more available to people of small means credit for provident purposes").

As laudable and important as this congressional policy may be, it is thin evidence that the NCUA failed to consider relevant factors and failed to adequately explain its decision. *Cf. H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 245 (1989) (refusing an invitation to invoke a statute's preamble and legislative history to give broad statutory language a specific reading). Moreover, the NCUA did consider the policy and concluded—based on its experience reviewing business and marketing plans since 2010—that credit unions were adequately serving low-income areas and would continue to do so without the core requirement, perhaps even "more effectively." *See* Fed. Reg. at 88,413–14. The NCUA explained that the Rule did not disturb the agency's mandate to consider complaints alleging discriminatory practices affecting underserved populations and to correct any discriminatory practices shown to exist. *Id.* at 88,414. In light of this reasonable explanation, the NCUA's decision to eliminate the core requirement was not arbitrary and capricious.

### 4.      Adjacent Areas

Next, the Rule allows a credit union serving a Single Political Jurisdiction, Core-Based Statistical Area, or Combined Statistical Area to add an adjacent area if the credit union can demonstrate that a "sufficient level of interaction" exists between the adjacent area and the already-served area such that the proposed service area "meets the requirements for being a local community." *Id.* at 88,440. The ABA's challenge to this aspect of the Rule fails.

Unlike the Rule's provisions that automatically qualify certain areas as belonging to a *local community* or *rural district*, the adjacent-area provision has no definitional import. Instead

it allows credit unions to submit documentation in support of a proposed service area, and the NCUA then decides on a case-by-case basis whether the proposed area belongs to a single local community. It is only after the NCUA evaluates an application that a definitional decision is made. While these individual decisions can be challenged, the ABA's current facial attack loses because individual applications might propose service areas well within a reasonable definition of *local community*. For example, a credit union serving Bethesda might apply to add neighboring Chevy Chase, and the NCUA's approval of that application would be unlikely to contradict the Act. If a credit union serving a local community does not initially serve the entire community, that is, the Act does not prohibit expansion into a greater portion of the community.

Neither is the adjacent-area provision arbitrary and capricious. The NCUA considered the relevant factors and articulated an adequate explanation for its decision. *See Fox*, 684 F.3d at 75. The NCUA explained that "[t]here is no statutory requirement or economic rationale that compels the Board to charter only the smallest [local community service map] in a particular area." 81 Fed. Reg. at 88,412 (quotation marks omitted).

The NCUA also chose reasonable factors for evaluating whether adjacent areas are part of the same local community. The Rule establishes that when evaluating a proposed adjacent area, the NCUA will consider whether the quintessential characteristics of a local community are present, including economic interdependence, related industries, intertwined traffic flows, shared governmental or quasi-governmental agencies, common educational institutions, and shared public services such as common police or fire protection. *Id.* at 88,415 & n.33; *see also* 80 Fed. Reg. 76,748, 76,772 (Dec. 10, 2015). This permits the NCUA to bring its reason and experience to bear. The NCUA's ability to accept or reject credit-union proposals on a case-by-case basis

allows it to make reasonable decisions about whether a proposed area is part of a single local community.

### B.     The NCUA's Definition of *Rural District*

Finally, the Rule increases the population limit for rural districts from 250,000 (or 3 percent of the relevant state) to one million. 81 Fed. Reg. at 88,440. The Rule also maintains a rurality requirement that either (1) most of the area's population resides in rural areas (as defined by government agencies) or (2) the area's population density does not exceed 100 persons per square mile. *Id.*

The original meaning of *rural district* dates to 1934. While the provision concerning community credit unions has been amended elsewhere since then, *rural district*—which has appeared unaltered in the statute since its incipiency—maintains its 1934 meaning. The NCUA argues that the modern meaning of *rural district* controls instead because in 1998 Congress gave the NCUA authority to define the term. Hr'g Tr. at 28–29. But because the statute allows the NCUA to define the term only within the bounds of reason, the interpretive question still requires reference to the standard meaning of *rural district* as used in the statute.[3] That meaning was not altered by the grant of definitional authority.

The parties do not dispute that in 1934 the word *rural* meant what it means now—the pastoral countryside, as opposed to an urban area. *See, e.g.*, Webster's New International

---

[3] This point is perhaps easiest illustrated with an example. The Constitution requires the federal government to protect a state from "domestic violence" upon the state's request. U.S. Const. art. IV, § 4. Scholars agree that this use of *domestic violence* refers to rioting or insurrection from within a state. Now, however, the term is commonly used to refer to abuse inside the home, as opposed to civil unrest. An inquiry into the reasonableness of a definition for *domestic violence* as used in the Constitution would require a comparison to the term's original meaning, not its modern meaning.

Dictionary (2d ed. 1934); Concise Oxford Dictionary of Current English, New Edition (1929). Their dispute is over how large a *district* can be when *rural* modifies it, and whether a district can be considered rural if most of the district's residents live in urban areas.

Dictionaries from around 1934 indicate that some areas described as *districts* were geographically expansive. They cite as examples the *District of Kentucky*, *District of Alaska*, and *District of Maine* (as those areas were known when not yet states). *See* 3 The Oxford English Dictionary (1933); 2 Dictionary of American English (1940). One dictionary defines *district* as a "region or territory whose limits and dimensions are approximately those of a state," or alternatively as an "extensive area, tract, or region having limits only vaguely defined." 2 Dictionary of American English (1940). Another dictionary defines *district* as "[a]ny portion of territory of undefined extent; region." Webster's Collegiate Dictionary (4th ed. 1931). Some definitions provide examples of much smaller districts, but others are quite large.[4]

---

[4] For more examples of definitions suggesting a potentially expansive geographic scope, see Webster's New International Dictionary (2d ed. 1934) (defining *district* as "[a] division of territory; a defined portion of a state, county, country, town, or city, etc., made for administrative, electoral, or other purposes . . . ."); American College Dictionary (1949) ("[A] region or locality."); 2 Dictionary of American English (1940) ("Any one of the various areas, differing greatly in size, regarded as an election or administrative unit . . . ."); *id.* (citing Illinois and Ohio as examples of the "extensive area[s]" regarded as districts for Methodist religious work).

For examples of definitions suggesting a narrower geographic scope, see 3 The Oxford English Dictionary (1933) ("In U.S. used in various specific and local senses . . . . In some States the chief subdivision of a county (*civil*, *magisterial*, *militia*, *justice's district*), called in other states *townships* or *towns*. Formerly, in South Carolina = county; elsewhere, a division of a state containing several counties."); 2 Dictionary of American English (1940) ("A county or similar subdivision of a state."); *id.* ("The neighborhood or community in which the one speaking resides."); *id.* ("A subdivision of a city serving as a unit for policing, fire prevention, political representation, etc.").

But geographically broad definitions of *district* do not necessarily mean that a *rural district* could be broad. It would be a mistake to conclude from these broad definitions that a *school district*, for example, could cover an entire state. And while few 1934-era dictionaries define the *rural district* term, those that do suggest that rural districts were smaller than a county. Webster's Second provides this definition of *rural district*: "In England, Wales, and Northern Ireland, a subdivision of an administrative county embracing usually several country parishes." Webster's New International Dictionary (2d ed. 1934); *see also* Funk & Wagnell's New Standard Dictionary of the English Language (1913) (similar). This definition has limited probative value because it reports non-American usage, but its presence in American dictionaries suggests some degree of American familiarity.

Relying on the fact that no dictionary definition for American usage of *rural district* exists, the NCUA argues that in America the phrase meant no more than the sum of its component words. Hr'g Tr. at 30. According to the NCUA, in other words, if an area was both *rural* and a *district*, it could fairly be considered a *rural district*. The Supreme Court has addressed precisely this question—whether a multi-word phrase carries distinct meaning—by "survey[ing] modern press usage" with a search of "computerized newspaper databases—both the New York Times database in Lexis/Nexis, and the US News database in Westlaw." *Muscarello v. United States*, 524 U.S. 125, 129 (1998). Those databases contain virtually no record of 1934-era language usage, but a more robust database indicates that the phrase *rural district* was used with some frequency in the first half of the twentieth century before mostly

---

For (British) dictionaries that define *district* with reference to rural areas, see 3 The Oxford English Dictionary (1933) (defining *district* as "[o]ne of the urban or rural subdivisions of a county"); Concise Oxford Dictionary of Current English, New Edition (1929) (same).

falling out of usage in the second half.[5]  This suggests that even if *rural district* does not carry meaning distinct from its individual words today, it did in 1934.

Usage of *rural district* in 1934-era judicial opinions also suggests that the term carried distinct meaning—and that it referred to areas much smaller than a state.  A Westlaw search for *rural district* in opinions published from 1920 through 1940 returns 293 cases.  *See* ABA Suppl. Mem. App. 6, Dkt. 32-6.  Of those, 144 provide clues to the term's geographic scope.[6]  Many of those (68) use *rural district* to refer to a rural school district.  The others also plainly refer to areas much smaller than a state.  For example, one opinion refers to a rural district "about five miles square."  *Robb v. Stone*, 146 A. 91, 91 (Pa. 1929).  Another mentions a utility company serving "a rural district adjoining the village [of Tupper Lake]."  *Vill. of Tupper Lake v. Maltbie*, 15 N.Y.S.2d 491, 493 (N.Y. App. Div. 1939).  A third opinion reports that a newspaper salesman sought to distribute papers "in a certain designated territory consisting of small villages and rural districts."  *Brechbiel v. Hentgen*, 8 N.E.2d 1007, 1007 (Ind. Ct. App. 1937).  Many opinions (23) refer to rural districts within a named city or county.  *See, e.g.*, *Blake v. Bd. of Educ. of City of Parsons*, 210 P. 351, 351 (Kan. 1922) (referring to a "rural district of Labette county").  Against the dozens of similar examples, not one opinion appears to envision a rural district approaching the size of a state.

---

[5] The database, called the Corpus of Historical American English, is a giant repository of text that houses more than 400 million words collected from fiction, non-fiction, magazines, and newspapers published from 1810 to 2017.  A search at corpus.byu.edu/coha for "rural district*" shows a dramatic decline in usage beginning around 1950.

[6] The phrase *the rural districts* was often used simply to distinguish from urban areas.  *See, e.g.*, *Widmer v. State*, 142 N.E. 145, 145 (Ohio Ct. App. 1924) ("[T]he people from the rural districts, joining with the people of the towns and villages, would gather . . . and have their contests.").  Opinions like *Widmer*, however, do not shed light on the size of any individual *rural district*.

Finally, the *noscitur* canon also indicates that *rural districts* were geographically small. As noted, the term *neighborhood* referred to an area smaller than a city. *See supra* Section III.A.1. And the term *community* referred to areas under "the same local laws" and not to "large geographical areas" with "widely diverse interests." *Id.*; *Lukens Steel*, 107 F.2d at 631; 2 The Century Dictionary and Cyclopedia (1911).

Yet the Rule defines certain areas significantly larger than most states as belonging to a single *rural district*. Here are three examples, shaded in red, blue, and yellow, of areas that qualify under the Rule:



*See* State Associations Amicus Br. at 22–24, 34–41, Dkt. 18. The red area includes most of Nevada along with portions of four adjoining states; the blue area includes Wyoming and portions of six adjoining states; and the yellow area includes portions of Texas, Oklahoma,

Kansas, Colorado, and New Mexico. Each area has a population density well under 100 persons per square mile. *Id.*

Not only are these areas geographically expansive, they also capture numerous urban centers. The yellow area, for example, includes the Amarillo, Texas Metropolitan Statistical Area, which has a population of more than 250,000 people. The Rule's rurality requirement originated in a previous iteration of the regulation and is not challenged here, but its low threshold exacerbates the deficiencies of the Rule's population-limit increase. It is the combination of the rurality requirement and the population-limit increase that qualifies Amarillo as part of a rural district. Similarly, because of the population-limit increase, the state of Wyoming now qualifies as belonging to a rural district even though 57 percent of the state's residents live in urban areas. *See* ABA Br. at 39.

As with other challenged provisions of the Rule, the NCUA left itself no escape hatch for fielding *rural district* applications. As long as a credit union's proposed service area meets the Rule's population and rurality requirements, the Rule automatically characterizes the area as a *rural district*—no matter its geographic size or the number or size of metropolitan areas falling within its proposed boundaries. And a definition of *rural district* that includes the expansive areas illustrated above is not even in the ballpark of the term's standard meaning. Because the Rule automatically qualifies areas larger than states as *rural districts* even though the term commonly referred to areas smaller than a county, the NCUA's definitional decision is unreasonable and manifestly contrary to the statute.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the ABA's motion for summary judgment, Dkt. 14, and the Court grants in part and denies in part the NCUA's

cross-motion for summary judgment, Dkt. 19.  A separate order consistent with this decision

accompanies this memorandum opinion.


_____
DABNEY L. FRIEDRICH
United States District Judge

Date:  March 29, 2018